## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAROL A. LEWIS, *et al.*,                )
                                    )     Case No. 18-cv-2929 (RBW)

       Plaintiffs,              )
                                      )     **DECLARATION OF JAMES**

v.                                       )     **PISTORINO IN SUPPORT OF**
                                      )     **CLASS CERTIFICATION MOTION**

ALEX M. AZAR II, in his official         )     **AND APPOINTMENT OF CLASS**
capacity as Secretary of Health and      )     **COUNSEL**
Human Services,                          )
                                      )
       Defendant.              )
_____)

    I, James Pistorino, declare:

    1.     I am over the age of 18, have never been convicted of a felony, and I make the following statements of my own free will.

    **Background**

    2.     I am a graduate of Duke University (B.S.C.S) and the Duke University School of Law (J.D.), and a partner at Parrish Law Offices.  I am a member of the State Bars of Texas and California as well as the Patent Bar and am admitted in numerous district and appellate federal courts across the country.  I have been practicing law (primarily federal litigation) for more than 20 years.  A copy of my curriculum vitae is attached as Exhibit 1.

    **Defendants' Document Production**

    3.     To date, the Secretary has made seven document productions Bates numbered Lewis00001-Lewis035889.  I have reviewed each of them and submit this declaration as a summary of this voluminous data and the analysis of the documents I have performed.

4.     Plaintiffs' document requests were limited to initial denials based on the allegation that a CGM was not "durable medical equipment", including seeking documents identifying and explaining the codes used to classify and reject claims on that grounds.

5.     In response, the Secretary produced documents such as Lewis002819 and Lewis004948 that indicate the codes used to classify, and reject, CGM claims as not durable medical equipment include: A9276; A9277; A9278; K0553; and K0554.

6.     In addition, for initial denial information for Part B claims, the Secretary produced a series of spreadsheets (in PDF form that hampered review) of claim denials using these codes during the class period for the various Medicare Administration Contractors (JA, JB, JC, and JD) within the United States.

7.     Each row in the spreadsheets contains data corresponding to an individual claim number.  Such data includes: a) the code used to reject the claim; b) the HICN of the claimant; c) the claim number; d) the date of service; e) the amount of coverage sought; f) the date the claim was paid or denied; and g) the associated denial code (e.g., A9276; A9277; A9278; K0553; and K0554) indicating that the claim was denied on the grounds that a CGM is not "durable medical equipment."

8.     I combined the various spreadsheets into a single Excel sheet that facilitated analysis.  That spreadsheet shows:

|  | Total Denied Claims December 13, 2012-July 31, 2019 | Claims denied December 13, 2013 and no longer pending on August 15, 2018 | Claims denied August 15, 2018-July 31, 2019 |
|---|---|---|---|
| People[1] | 58,928 | 34,564 | 34,828 |
| Claims | 252,337 | 163,271 | 89,066 |

9.      For Part C (*i.e.*, "Medicare Advantage Plan") initial denials, the Secretary's production included no information.  In order to estimate the number of such claims, I reviewed the Kaiser Family Foundation Data Note dated June 2019.  A copy is attached as Exhibit 2.  As reflected there, during the class period, Part C cases constituted approximately 1/3 of all Medicare beneficiaries.

10.      Based on that and the data disclosed regarding Part B cases, I estimate the Part C cases as follows:

|  | Total Denied Claims December 13, 2012-July 31, 2019 | Claims denied December 13, 2013 and no longer pending on August 15, 2018 | Claims denied August 15, 2018-July 31, 2019 |
|---|---|---|---|
| People | 29,464 | 17,282 | 17,414 |
| Claims | 126,168 | 81,635 | 44,533 |

11.      With regard to appeals, the production from the Secretary did not include re-determination appeals for Part B claims for the period December 13, 2012-July 2016 for at least

---

[1] This number is complicated by the fact that 7,276 HICNs include indications that the HICN reported may be for a person other than the beneficiary.  Thus, the actual number of unique people may be as low as 51,652 or some number in-between.  Because the information necessary to uniquely identify a beneficiary has not been produced by the Secretary, each unique HICN having a CGM claim is used in this analysis.  The subcolumns do not add up to the total because a single person could have had expired claims as well as claims that were pending when suit was filed or filed after.

one of the jurisdictions.  The Secretary also failed to produce any reconsideration data (i.e., the first level of appeal in Part C cases) for Part C claims.

12.     Reviewing the appeal level data that was produced for Part B and Part C cases shows:

| | Part B | Part C |
|---|---|---|
| **People/Claims** | 58,928/252,337 | 29,464/126,168 (estimated) |
| **Redeterminations** | 2,809 | No data[2] |
| **Reconsiderations** | 543 | 661[3] |
| **ALJ Decisions** | 196 | 91 |
| **MAC Decisions** | 145 | (included in the 145) |

13.     Reviewing the Part B data and the total number of persons therein, I calculated that the average claimant had $4,624 in denied claims.

**Parrish Law Offices Medicare/CGM Litigation Experience**

14.     Parrish Law Offices has been in existence since 2000 with its main office in Pittsburgh, Pennsylvania.  Since then, specializing in Medicare coverage litigation, Parrish Law Offices has handled literally thousands of appeals of denials of Medicare coverage claims.

15.     Parrish Law Offices took on its first Medicare CGM client in August 2013 and, to date, has represented more than 35 Medicare beneficiaries in administrative appeals of the denials of their Medicare claims, including at least 63 ALJ hearings.

16.     The firm has been involved in four District Court actions attempting to force the Secretary of Health to comply with Congressional mandates that provide coverage of continuous

_____

[2] In Part C cases, this level of appeal is referred to as "reconsideration."

[3] In Part C cases, this level of appeal is referred to as "reconsidered determination."

glucose monitoring.  The firm was successful in all four actions securing Medicare coverage of a continuous glucose monitor for each of the Medicare beneficiaries at issue.  *See Smith v. Azar*, Case No. 18-cv-181-MOC (W.D. N.C.); *Whitcomb v. Azar*, Case No. 17-cv-14-DEJ (E.D. Wisc.); *Lewis v. Burwell*, Case No. 15-cv-13530-NMG (D. Mass.); and *Bloom v. Burwell*, Case No. 16-cv-121-GWC (D. Vermont).

17.     In addition, the firm currently represents the plaintiffs in two pending cases.  *See Zieroth v. Azar*, Case No. 20-cv-172-MMC (N.D. Cal.) and *Olsen v. Azar*, Case No. 19-cv-3814-RBW (D.D.C.)

18.     The firm has filed multiple challenges against various Medicare contractors who have issued Medicare non-coverage policies relative to continuous glucose monitoring.

19.     Based on the firm's pro bono representation of numerous Medicare beneficiaries who have diabetes and need a continuous glucose monitor, Ms. Parrish was awarded the American Bar Association's *Pro Bono Publico* Award in 2017.

20.     Based on its effective advocacy, the firm has been invited to present at various professional meetings of clinicians and advocacy groups regarding Medicare administrative appeals and civil litigation.

21.     Parrish Law Offices has assisted various legal aid offices and clinics representing Medicare beneficiaries seeking Medicare coverage of CGMs.

22.     In investigating and identifying potential claims, Parrish Law Offices has left no stone unturned.  In addition to multiple rounds of written discovery in this case, Parrish Law Offices has served at least two FOIA requests seeking denial information from the Secretary.

23.     Currently, Parrish Law Office has staffed this case with attorneys James Pistorino, Debra Parrish, and Bridget Noonan - assisted by paralegal Tanya Tarza.

24.     Copies of the curriculum vitaes of Debra Parrish and Bridget Noonan are attached as Exhibit 3.

25.     Parrish Law Offices is committed to investing whatever resources are necessary to properly represent the class in this matter.

I declare under penalty of perjury, except for statements made upon information and belief, that the statements made herein are true and correct and if called upon as a witness I would testify thereto.

Executed this 23rd day of March, 2020 at Menlo Park, California.


_/s/James Pistorino_
James Pistorino

# Exhibit 1

# JAMES CHARLES PISTORINO
224 Lexington Dr.
Menlo Park, CA 94025
(650) 400-0043
james.pistorino@gmail.com

**EXPERIENCE:**

| | |
|---|---|
| September 2015 - present | **PARTNER:** Parrish Law Office: Appellate practice at the Federal Circuit and US Supreme Court. District court litigation including class actions. |
| March 2011 – September 2015 | **PARTNER.** Perkins Coie, LLP. Intellectual Property litigation involving patents and copyrights and breach of contract actions in federal courts and arbitrations. |
| 2004-2011, 1996-2004 | **PARTNER/ASSOCIATE.** Howrey Simon Arnold & White (formerly Arnold, White & Durkee). Involved in full range of intellectual property representation including patent, copyright, trademark, and trade secret litigation, patent and trademark prosecution, motion and appellate practice, contracts, and legal research. Special emphasis on computer software related issues. |
| March – May 2001 | **ASSISTANT DISTRICT ATTORNEY.** Dallas County District Attorney's Office. Participated in the Lawyer's On Loan program prosecuting misdemeanor cases. Prosecuted thirteen (13) jury trials and five (5) trials before the Court. |
| May - August, 1995 | **LAW CLERK.** United States International Trade Commission, Office of Unfair Import Investigations. Legal research and memoranda related to patent infringement litigation. |

**REPRESENTATIVE MATTERS:**

*Driessen v. Sony Music Entertainment, et al.* (Utah)
    Defend Sony Music, Best Buy, Target, FYE in patent case involving music cards
*Clouding v. Amazon, Inc., et al.* (Del)
    Defend Amazon, Rackspace, Dropbox in cases related to cloud computing
*Round Rock Research LLC v. AsusTek Computer Inc., et al.* (Del)
*AsusTek Computer Inc. et al. v. Round Rock Research LLC* (ND Cal)
    Defend AsusTek in cases involving 16 patents related to computer components
*Technology Innovations Associates, LLC v. Google, Inc.* (Del)
    Defend Google in patent case involving user interfaces
*Mount Hamilton Partners LLC v. Google, Inc.* (ND Cal)
    Defend Google in patent case related to coupons
*FuzzySharp Technologies Inc. v. Intel Corp.* (ND Cal)
    Defend Intel in patent case related to 3D graphics

    *Techsavies LLC v. WDFA Marketing, Inc.* (ND Cal) (2010-2011)
        Represent TechSavies in breach of contract/copyright matter
    *Scientific Plastic Products, Inc. v. Merck & Co., Inc., et al.* (SD Cal) (2009)
        Defend Merck in patent case related to flash chromatography
    *CalCars, Inc. v. California Cars Initiative, Inc.* (CD Cal) (2008)
        Defend CCI in trademark infringement dispute
    *Anticancer v. Merck & Co., Inc.et al.* (SD Cal) (2007-10)
        Defend Merck in five patent case related to green fluorescent protein
    *Visto Corp. v. Seven Networks, Inc.* (ED Tex) (2005-2007)
        Defend Seven in multiple cases related to email synchronization
    *Streck Laboratories v. Beckman Coulter et al* (Neb) (1999-2000)
        Represent Streck in patent case related to blood substitutes

## ADMISSIONS:

    State Bars of California and Texas, United States Patent & Trademark Office, United States Courts of Appeals for the Fifth Circuit and the Federal Circuit, United States Supreme Court

## EDUCATION:

**Duke University School of Law**, Durham, NC.
    J.D. May 1996
**Duke University**, Durham, NC.
    B.S. with Distinction in Computer Science May 1993

## PUBLICATIONS/MEMBERSHIPS:

SF Bay Area IP Inn of Court
    President (2012 –2014), Vice-President (2010-12), Treasurer (2008-10)
University of California Hastings Schools of Law (Spring 2013-Spring 2016t)
    Adjunct professor, Patent Litigation
Santa Clara University (Summer 2012)
    Adjunct professor, Patent Litigation Strategies and Tactics

James C. Pistorino, *2012 Trends in Patent Case Filings*, BNA, (February 2013)
James C. Pistorino, *2011 Trends in Patent Case Filings*, BNA, (March 2012)
James C. Pistorino, *Concentration of Patent Cases Increases in Eastern District of Texas in 2010,* BNA, (April 2011)
James C. Pistorino, *Another Way to Attack Written Description in Re-Exam*, IPLaw360 (August 2010)
Glenn W. Rhodes, PATENT LAW HANDBOOK (1998-99, 1999-2000 eds)
    Chapter on summary judgment, portions of chapter on equitable defenses.
James C. Pistorino, *Recent Developments in Patent Law*,
    6 TEX. INTELL. PROP. LAW. J. 355 (1998).

Numerous speeches to ACC and other groups.  2015-2020 SuperLawyer.

# Exhibit 2



June 2019 | Data Note

# A Dozen Facts About Medicare Advantage in 2019

Gretchen Jacobson, Meredith Freed, Anthony Damico, and Tricia Neuman

Medicare Advantage enrollment has grown rapidly over the past decade, and Medicare Advantage plans have taken on a larger role in the Medicare program. This data collection provides current information and trends about Medicare Advantage enrollment, premiums, and out-of-pocket limits. It also includes analyses of Medicare Advantage plans' extra benefits and prior authorization requirements.

## 1. Enrollment in Medicare Advantage has nearly doubled over the past decade



Figure 1

**Total Medicare Advantage Enrollment, 1999-2019**
(in millions)

| Year | Enrollment | % of Medicare Beneficiaries |
|------|-----------|------------------------------|
| 1999 | 6.9 | 18% |
| 2000 | 6.8 | 17% |
| 2001 | 6.2 | 15% |
| 2002 | 5.6 | 14% |
| 2003 | 5.3 | 13% |
| 2004 | 5.3 | 13% |
| 2005 | 5.6 | 13% |
| 2006 | 6.8 | 16% |
| 2007 | 8.4 | 19% |
| 2008 | 9.7 | 22% |
| 2009 | 10.5 | 23% |
| 2010 | 11.1 | 24% |
| 2011 | 11.9 | 25% |
| 2012 | 13.1 | 27% |
| 2013 | 14.4 | 28% |
| 2014 | 15.7 | 30% |
| 2015 | 16.8 | 31% |
| 2016 | 17.6 | 31% |
| 2017 | 19.0 | 33% |
| 2018 | 20.4 | 34% |
| 2019 | 22.0 | 34% |

NOTE: Includes cost plans as well as Medicare Advantage plans. About 64 million people are enrolled in Medicare in 2019.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment Files, 2008-2019, and MPR, 1999-2007; enrollment numbers from March of the respective year, with the exception of 2006, which is from April.

**KFF**

In 2019, one-third (34%) of all Medicare beneficiaries – 22 million people – are enrolled in Medicare Advantage plans, similar to the rate in 2017 and 2018.  Between 2018 and 2019, total Medicare Advantage enrollment grew by about 1.6 million beneficiaries, or 8 percent – nearly the same growth rate as the prior year.  The Congressional Budget Office (CBO) projects that the share of beneficiaries enrolled in Medicare Advantage plans will rise to about 47 percent by 2029.

Headquarters / 185 Berry Street Suite 2000 San Francisco CA 94107 / 650 854 9400
Washington Offices and Conference Center / 1330 G Street NW Washington DC 20005 / 202 347 5270

kff.org / Email Alerts: kff.org/email / facebook.com/KaiserFamilyFoundation / twitter.com/KaiserFamFound

Filling the need for trusted information on national health issues, the Kaiser Family Foundation is a nonprofit organization based in San Francisco, California.



**KFF**

HENRY J KAISER
FAMILY FOUNDATION

## 2. The share of Medicare beneficiaries in Medicare Advantage plans across the United States ranges from 1% to over 40%



Figure 2

Medicare Advantage Penetration, by State, 2019

National Average, 2019 = 34%

| ≤10% | 11% - 20% | 21% - 30% | 31% - 40% | ≥41% |
|---|---|---|---|---|
| 2 states | 12 states + DC | 8 states | 22 states | 6 states + PR |

NOTE: Includes cost plans, as well as other Medicare Advantage plans. Excludes beneficiaries with unknown county addresses.
SOURCE: Kaiser Family Foundation analysis of CMS State/County Market Penetration Files, 2019.

KFF

The share of Medicare beneficiaries in Medicare Advantage plans (including Medicare cost plans), varies across the country. In 28 states and Puerto Rico, at least 31 percent of Medicare beneficiaries are enrolled in Medicare Advantage plans, with more than 40 percent of enrollees in six states (HI, FL, MN, OR, WI, PA) and Puerto Rico. The majority of the Medicare private health plan enrollment in Minnesota has historically been in cost plans, rather than Medicare Advantage plans, but as of 2019, most cost plans in Minnesota are no longer offered and have been replaced with risk-based HMOs and PPOs. Medicare Advantage enrollment is relatively low (20 percent or lower) in 14 states and the District of Columbia, including two mostly rural states where it is virtually non-existent (AK and WY).

## 3. The share of Medicare beneficiaries in Medicare Advantage plans varies across counties from less than 1% to more than 60%



Figure 3
Medicare Advantage Penetration, by County, 2019

National Average, 2019 = 34%

| <1% | 1% - 10% | 11% - 20% | 21% - 30% | 31%-40% | 41%-50% | ≥51% |
| 174 counties | 445 counties | 643 counties | 896 counties | 635 counties | 256 counties | 172 counties |

NOTE: Includes cost plans, as well as Medicare Advantage plans. Excludes beneficiaries with unknown county addresses.
SOURCE: Kaiser Family Foundation analysis of CMS State/County Market Penetration Files, 2019.

**KFF**

Within states, Medicare Advantage penetration varies widely across counties. For example, in Florida, 66 percent of all beneficiaries living in Miami-Dade County are enrolled in Medicare Advantage plans whereas only 10 percent of beneficiaries living in Monroe County (Key West) do so. In 172 counties, accounting for 10 percent of the population, more than half of all Medicare beneficiaries are enrolled in Medicare Advantage plans or cost plans. Many of these counties are centered around large, urban areas, such as Monroe County, NY (66%), which includes Rochester, and Allegheny County, PA (61%), which includes Pittsburgh. In contrast, in 619 counties, accounting for 4 percent of Medicare beneficiaries, no more than 10 percent of beneficiaries are enrolled in Medicare private plans; many of these low penetration counties are in rural parts of the country but some urban areas, such as Baltimore City (17%), also have relatively low Medicare Advantage enrollment.

## 4. Most Medicare Advantage enrollees are in plans operated by UnitedHealthcare, Humana, or BlueCross BlueShield (BCBS) affiliates in 2019



Figure 4

Medicare Advantage Enrollment by Firm or Affiliate, 2019

**Total Medicare Advantage Enrollment, 2019 = 22 Million**

NOTE: All other insurers includes firms with less than 2% of total enrollment. BCBS are BlueCross and BlueShield affiliates and includes Anthem BCBS plans. Anthem non-BCBS plans is less than 2% of total enrollment.
Percentages may not sum to 100% due to rounding.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment Files, 2019.

**KFF**

Medicare Advantage enrollment is highly concentrated among a small number of firms. UnitedHealthcare and Humana together account for 44 percent of all Medicare Advantage enrollees nationwide, and the BCBS affiliates (including Anthem BCBS plans) account for another 15 percent of enrollment in 2019. Another four firms (CVS/Aetna, Kaiser Permanente, Wellcare, and Cigna) account for another 22 percent of enrollment in 2019. For the third year in a row, enrollment in UnitedHealthcare's plans grew more than any other firm, increasing by about 520,000 beneficiaries between March 2018 and March 2019. CVS purchased Aetna in 2018 and the combined company had the second largest growth in Medicare Advantage enrollment in 2019, increasing by also about 520,000 beneficiaries between March 2018 and March 2019.

## 5. Half of Medicare Advantage enrollees pay no premium (other than the Part B premium) in 2019



Figure 5

Distribution of Medicare Advantage Enrollees, by Prescription Drug Plan Premium, 2019

$100+ per month **7%**

$50-$99 per month **14%**

$20-$49 per month **18%**

Average premium among enrollees paying premiums, 2019 = **$65** per month

No premium **56%**

Less than $20 per month, **5%**

**Average premium, 2019 = $29 per month**

NOTE: Includes only Medicare Advantage plans that offer Part D benefits (MA-PDs) because these plans comprise the majority of Medicare Advantage plans. Excludes SNPs, employer-sponsored group plans, demonstrations, HCPPs, PACE plans, and plans for special populations. Premiums were missing for less than 1% of enrollees.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Landscape and Enrollment Files, 2019.

**KFF**

In 2019, 90% of Medicare Advantage plans offer prescription drug coverage (MA-PDs), and most Medicare Advantage enrollees (88%) are in plans that include this prescription drug coverage. More than half of these beneficiaries (56%) pay no premium for their plan, other than the Medicare Part B premium. However, 21 percent of beneficiaries in MA-PDs (3.0 million enrollees) pay at least $50 per month, including 7 percent who pay $100 or more per month, in addition to the monthly Part B premium ($135.50 in 2019). Among MA-PD enrollees who pay a premium for their plan, the average premium is $65 per month. All together, including those who do not pay a premium, the average MA-PD enrollee pays $29 per month in 2019.

## 6. Premiums paid by Medicare Advantage enrollees have slowly declined since 2015



Figure 6

Average Monthly Medicare Advantage Prescription Drug Plan Premiums, Weighted by Plan Enrollment, 2010-2019

NOTE: Includes only Medicare Advantage plans that offer Part D benefits (MA-PDs) because they comprise the majority of Medicare Advantage plans. Excludes SNPs, employer-sponsored group plans, HCPPs, PACE plans, and plans for special populations. The total includes cost plans and PFFS plans (not shown separately), as well as plans with zero premiums. The premiums for a subset of sanctioned plans were not available in 2011, and were excluded from this analysis.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Landscape and Enrollment Files, 2010-2019.

Nationwide, average Medicare Advantage Prescription Drug (MA-PD) premiums declined by $5 per month between 2018 and 2019, much of which was due to the relatively sharp decline in premiums for local PPOs this past year, and since 2015. Average premiums for HMOs also declined $3 per month, while premiums for regional PPOs were relatively similar between 2018 and 2019. Average MA-PD premiums vary by plan type, ranging from $23 per month for HMO enrollees to $39 per month for local PPO enrollees and $44 per month for regional PPO enrollees. Nearly two-thirds (62%) of Medicare Advantage enrollees are in HMOs, 31% are in local PPOs, and 6% are in regional PPOs in 2019.

## 7. For Medicare Advantage enrollees, the average out-of-pocket limit is $5,059 for in-network services and $8,649 for both in-network and out-of-network services (PPOs)



Figure 7

Average Medicare Advantage Plan Out-of-Pocket Limits, Weighted by Plan Enrollment, 2019

*Total limit for Part A and B services received in-network and/or out-of-network:*

Legend: Limit increase if out-of-network services are used; Limit for in-network services

| | Average In-Network Limits (HMOs & PPOs) | Average Limits for Coverage of Out-Of-Network Services (PPOs) | HMOs | Local PPOs | Regional PPOs |
|---|---|---|---|---|---|
| Limit for in-network services | $5,059 | $5,822 | $4,706 | $5,652 | $6,471 |
| Limit increase if out-of-network | | $2,996 | | $3,144 | $2,431 |
| Total | $5,059 | $8,818 | $4,706 | $8,796 | $8,901 |
| Number of enrollees | 13.3 million | 4.2 million | 9.1 million | 3.3 million | 0.9 million |

NOTE: Excludes SNPs, EGHPs, PACE plans, and POS plans. POS plans include about 1 million enrollees; about 40% do not have an out-of-network out-of-pocket limit, about 30% have a combined out-of-pocket limit, and about 30% have separate in-network and out-of-network out-of-pocket limits. About 1% of local PPO enrollees have separate in-network and out-of-network out-of-pocket limits.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment and Landscape Files, 2019.

KFF

In 2019, Medicare Advantage enrollees' average out-of-pocket limit for in-network services is $5,059 (HMOs and PPOs) and $8,818 for out-of-network services (PPOs). For HMO enrollees, the average out-of-pocket (in network) limit is $4,706; these plans do not cover services received from out-of-network providers. For local and regional PPO enrollees, the average out-of-pocket limit for both in-network and out-of-network services are $8,796, and $8,901, respectively.

Since 2011, the Administration has required Medicare Advantage plans to provide an out-of-pocket limit for services covered under Parts A and B not to exceed $6,700 (in-network) or $10,000 (in-network and out-of-network combined). Limits have been required for regional PPOs since 2006.

HMOs generally only cover the services provided by in-network providers, whereas PPOs also cover services delivered by out-of-network providers but charge enrollees higher cost-sharing for this care. The size of Medicare Advantage provider networks for physicians and hospitals vary greatly both across counties and across plans in the same county.

## 8. Most Medicare Advantage enrollees have access to some benefits not covered by traditional Medicare in 2019



Figure 8

Share of Medicare Advantage Enrollees in Plans with Extra Benefits by Benefit Type, 2019

67% Dental Benefit

72% Fitness Benefit

78% Eye exams or glasses

SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment and Benefit Files, 2019.

KFF

Medicare Advantage plans may provide extra benefits that are not offered in traditional Medicare, and can use rebate dollars to help cover the cost of extra benefits. Plans can also charge additional premiums for such benefits. Most enrollees are in plans that provide access to some dental care (67%), a fitness benefit (72%), and/or eye exams or glasses (78%). Since 2010, the share of enrollees in plans that provide some dental care or fitness benefits has increased (from 48% and 52% of enrollees, respectively) while the share with a vision benefit has been relatively steady (77% in 2010).

## 9. Nearly four out of five Medicare Advantage enrollees are in plans that require prior authorization for some services



Figure 9

### Share of Medicare Advantage Enrollees Required to Receive Prior Authorization, by Service, 2019

Most enrollees are required to receive prior authorization for the highest cost services and fewer enrollees need to receive it for preventive services

NOTE: Preventive services are Medicare-covered zero-dollar cost-sharing preventive services.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment and Benefit Files, 2019.

**KFF**

Medicare Advantage plans can require enrollees to receive prior authorization before a service will be covered, and nearly four out of five Medicare Advantage enrollees (79%) are in plans that require prior authorization for some services in 2019.  Prior authorization is most often required for relatively expensive services, such as inpatient hospital stays, skilled nursing facility stays, and Part B drugs, but infrequently required for preventive services.  Beginning in 2019, Medicare Advantage plans can also require enrollees to use "step therapy" for Part B drugs, meaning that they are required to try some specific drugs (and fail to improve on those drugs) before they receive approval to try other drugs. In contrast to Medicare Advantage plans, traditional Medicare does not generally require prior authorization for services, and does not require step therapy for Part B drugs.

## 10. The majority (72%) of Medicare Advantage enrollees are in plans that receive high quality ratings (4 or more stars) and related bonus payments



Figure 10
Distribution of Medicare Advantage Enrollees by Plan Star Rating, 2015-2019

NOTE: Excludes SNPs, employer-sponsored group plans, HCPPs, PACE plans, and plans for special populations. Totals may not sum due to rounding. Less than 1% of enrollees were in plans with 2 stars during all years shown.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Landscape and Enrollment Files for 2015 – 2019.

In 2019, more than two-thirds (72%) of Medicare Advantage enrollees are in plans with quality ratings of 4 or more stars, a decrease from 74 percent in 2018. An additional 2 percent of enrollees are in plans that were not rated because they were part of contracts that had too few enrollees or were too new to receive ratings. Plans with 4 or more stars and plans without ratings are eligible to receive bonus payments for each enrollee the following plan year (2020). The share of enrollees in plans with 2.5 stars (below average ratings) nearly doubled from 3 percent in 2018 to 6 percent (nearly 1 million people) in 2019.

For many years, the Centers for Medicare and Medicaid Services (CMS) has posted quality ratings of Medicare Advantage plans to provide beneficiaries with additional information about plans offered in their area. All plans are rated on a 1 to 5-star scale, with 1 star representing poor performance, 3 stars representing average performance, and 5 stars representing excellent performance. CMS assigns quality ratings at the contract level, rather than for each individual plan, meaning that each plan covered under the same contract receives the same quality rating (and most contracts cover multiple plans).

## 11. One in five Medicare Advantage enrollees are in employer or union-sponsored group plans in 2019



Figure 11

Distribution of Medicare Advantage Enrollees, by Plan Type, 2019

Employer/ union-sponsored group plans
20%

Individual plans, open for general enrollment
67%

Special Needs Plans
13%

**Total Medicare Advantage Enrollment, 2019 = 22 Million**

NOTE: Excludes beneficiaries with unknown county addresses.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment Files, 2019

KFF

One in five Medicare Advantage enrollees (4.4 million) are in group plans offered by employers and unions for their retirees in 2019. Under these arrangements, employers or unions contract with an insurer and Medicare pays the insurer a fixed amount per enrollee to provide benefits covered by Medicare. The employer or union (and sometimes the retiree) may also pay a premium for additional benefits or lower cost-sharing. Group enrollees comprise a disproportionately large share of Medicare Advantage enrollees in ten states: Alaska (100%), West Virginia (50%), Michigan (49%), New Jersey (42%), Illinois (39%), Kentucky (38%), Wyoming (37%), Maryland (36%), Delaware (35%), and New Hampshire (33%).

## 12. Nearly 3 million Medicare beneficiaries are enrolled in Special Needs Medicare Advantage Plans in 2019



Figure 12

**Number of Beneficiaries in Special Needs Plans, 2006-2019** (in millions)

NOTE: Numbers may not sum to the total due to rounding. Includes enrollment in Puerto Rico.
SOURCE: Kaiser Family Foundation analysis of CMS Medicare Advantage Enrollment Files, 2006-2019.

KFF

Special Needs Plans (SNPs) restrict enrollment to specific types of beneficiaries with significant or relatively specialized care needs. The majority of SNP enrollees (85%) are in plans for beneficiaries dually eligible for Medicare and Medicaid (D-SNPs), with the remainder in plans for beneficiaries requiring a nursing home or institutional level of care (I-SNPs), or with severe chronic or disabling conditions (C-SNPs.)

Enrollment in SNPs increased modestly from 2.6 million beneficiaries in 2018 to 2.9 million beneficiaries in 2019, accounting for about 13 percent of total Medicare Advantage enrollment in 2019, with some variation across states. In seven states, the District of Columbia, and Puerto Rico, enrollment in SNPs comprises at least one-fifth of Medicare Advantage enrollment (51% in DC, 49% in PR, 25% in SC, 22% in NY, 21% in AR, 20% in AZ, 20% in FL, 20% in GA, and 20% in TN).  Most C-SNPs enrollees (93%) are in plans for people with diabetes or cardiovascular disorders in 2019. Enrollment in I-SNPs has been increasing, but is still less than 100,000 beneficiaries.

Gretchen Jacobson, Meredith Freed, and Tricia Neuman are with KFF.
Anthony Damico is an independent consultant.

### Data and Methods

This analysis uses data from the Centers for Medicare and Medicaid Services (CMS) Medicare Advantage Enrollment, Benefit and Landscape files for the respective year, with enrollment data from March of each year. Cost plans are grouped with Medicare Advantage plans, and this chart collection uses the term Medicare Advantage to refer to both types of plans, even though cost plans are paid differently and subject to different rules.

# Exhibit 3

# Debra M. Parrish

788 Washington Road                                    1050 Conn. Ave., 10th Fl.
Pittsburgh, PA  15228                                   Washington, DC 20036
412-561-6250                                            202-772-4254

debbie@dparrishlaw.com
412-561-6253 (fax)
412-337-2718 (cell)

## PROFESSIONAL EXPERIENCE

- **Parrish Law Offices,** 1999-Present

    Representing and counseling health care providers, research institutions, journals and life science companies in the areas of health care law (including reimbursement for innovative technology), science law (compliance with research regulations, investigations and research misconduct), intellectual property (including litigation, licensing, contracts and employee agreements).

- **Titus & McConomy LLP,** elected partner in 1996, 1994-1999

    Involved in complex litigation, science law (including research misconduct and research regulations, compliance and investigations including criminal investigations of life science companies), intellectual property (patent prosecution and litigation) and health care law.

- **Office of Research Integrity, Office of the General Counsel, Department of Health & Human Services,** 1992-1994

    Drafted rules and regulations governing scientific misconduct and research fraud; reviewed, investigated and prosecuted allegations of scientific misconduct.

- **Fulbright & Jaworski,** Washington, DC, Associate, 1989-1992

    Represented national health care clients on medical staff issues, Medicare/Medicaid reimbursement, and litigation involving health care providers; litigated intellectual property cases.

## EDUCATION
- **J.D., Duke University School of Law**
- **B.S.E., Biomedical Engineering, Duke University**
- **M.P.H., Johns Hopkins Bloomberg School of Public Health (expected 2021)**

## BAR MEMBERSHIPS AND ASSOCIATIONS
- **United States Court of Appeals for the Second Circuit**
- **United States Court of Appeals for the Ninth Circuit**
- **United States Court of Appeals for the Eleventh Circuit**
- **American Health Lawyers Association**
- **Society for Research Administrators**

- **National Association of College and University Attorneys**
- **American Bar Association, 2017 winner of the *Pro Bono Publico* Award**
- **Pennsylvania, North Carolina, District of Columbia and Florida Bar**
- **Patent Bar**
- **Allegheny County Bar Association**
- **Public Responsibility in Medicine and Research**
- **Council of Science Editors**

## ACTIVITIES

- **Council of Science Editors,** Editorial Policy Committee, 2004-Present
- **International Business Ethics Institute,** Director and Consultant, 1994-present
- **Institutional Review Board,** University of Pittsburgh Medical Center, 1994-1999
- **Adjunct Professor, University of Pittsburgh Medical Center,** Spring 2016

## SELECTED SPEECHES

National Presentations

- **"Research Misconduct:  A Year in Review,"** Society of Research Administrators International, San Francisco, CA, October 2019

- **"Patents and IP Protection:  Why They Matter to Us,"** Society of Research Administrators International, San Francisco, CA, October 2019

- **"Advocacy for Medicare Coverage for Diabetes,"** American Association of Diabetes Educators, Baltimore, MD, August 2018.

- **"DMEPOS Update,"** American Health Lawyers Association, Baltimore, MD, March 2017.

- **"Master Class:  Billing Compliance,"** MAGI's Clinical Research Conference, Las Vegas, NV, October 23, 2016.

- **"Research Misconduct: A Year in Review,"** Society of Research Administrators, Annual Meeting, San Antonio, TX, October 26, 2016.

- **"The Journals' Role in Research Misconduct Cases,"** Society of Research Administrators, Annual Meeting, San Antonio, TX, October 25, 2016.

- **"Patient Access to Medications,"** panel discussion, Corporate AACE Partnership (CAP), Boston, MA, October 14, 2016.

- **"Standardization of Processes for Handling Research Misconduct,"** National Academy of Sciences Journal Summit, Washington, DC, March 17, 2016.

- **"DMEPOS Update,"** American Health Lawyers Association, Baltimore, MD, March 2016.

- **Patient Access to Medications,"** American Association of Clinical Endocrinologist, Boston, MA, Oct. 14, 2016.

- **"Top Ten Issues for Research Universities,"** moderator, National Association of College and University Attorneys Annual Meeting, Chicago, IL, June 2013.

Local and Regional Presentations

- **"Reimbursement Considerations for Clinical Diagnostic Tests,"** Pennsylvania Life Sciences & Association of University Technology Managers, Philadelphia, PA, October 2018.

- **"Research Misconduct and Clinical Trials"** and **"Research Misconduct and Graduate Students,"** Society for Research Administrators, Minneapolis, MN, April 28 and 29, 2014.

- **"Reimbursement with a Global Fair Panel,"** Pennsylvania Bio (BioTech 2010), Philadelphia, PA, October 2010.

- **"Successfully Taking Your Claims Through the Medicare Appeals Process,"** Pennsylvania Bio (BioTech 2010), Philadelphia, PA, October 2010.

- **"Reimbursement for New Medical Technology,"** Carnegie Mellon University, Pittsburgh, PA, April 2010.

# SELECTED ARTICLES

- **"Federal Agencies Can Do More To Ensure Correction of the Literature,"** Accountability in Research, Vo. 25, issue 6, Sept. 2018.

- **"The Physician Payment Sunshine Act,"** Ethical Editor, May 2014.

- **"Research Misconduct in Clinical Trials and Clinical Research,"** Ethical Editor, July 2012.

- **"White Paper on Promoting Integrity in Scientific Journal Publications,"** Council of Science Editors, March 2012.

- "**Expressions of Concern and Their Uses,"** by Bridget Noonan and Debra M. Parrish, Learned Publishing, July 2008 Vol. 21, No. 3.

- **"Research Misconduct and Plagiarism,"** by Debra M. Parrish**,** Journal of College and University Law, January 2007, Vol. 33, No. 1.

- **White Paper on Promoting Integrity in Scientific Journal Publications,"** Council of Science Editors, Editorial Policy Committee (2006).

**Bridget Noonan**
**788 Washington Road**
**Pittsburgh, PA 15228**
**Phone: 412-561-6250**
**Fax: 412-561-6253**
**E-mail: bridget@dparrishlaw.com**

---

## PROFESSIONAL EXPERIENCE

- August 2012-Present   **Associate at Parrish Law Offices (Pittsburgh, PA)**
  Prepare appeals to the Office of Medicare Hearings and Appeals and the Medicare Appeals Council for a variety of durable medical equipment companies, laboratories, and health care providers; prepare relevant briefing for appeals to the Office of Medicare Hearings and Appeals; manage individual beneficiary case flow; currently researching and writing about topics in the field of research misconduct

- Summer 2011   **Paralegal at Parrish Law Offices (Pittsburgh, PA)**
  Prepared administrative law judge requests, pre-hearing briefs, and appeals to the Medicare Departmental Appeals Board; researched, edited, and prepared articles concerning research misconduct; helped update a manual used by journal editors in addressing allegations of research misconduct

- Fall 2010   **Duquesne University School of Law Urban Development Law Clinic**
  Assisted clients with transferring title of real property in association with NeighborWorks of Western Pennsylvania; worked with local townships to discuss the feasibility of conservatorship for their abandoned or blighted properties

- 2004-2010   **Paralegal and Research Assistant at Parrish Law Offices (Pittsburgh, PA)**
  Researched case law for briefs in support of research misconduct clients; prepared and edited manuscripts concerning research misconduct issues; prepared administrative law judge requests for Medicare reimbursement claims.  Prepared discovery request and helped prepare briefs for clients in research misconduct civil litigation.

## EDUCATION

- Duquesne University School of Law, 2012 J.D.
- University of Pittsburgh 2008, *summa cum laude*
  B.A. History, B.A. Political Science

## BAR MEMBERSHIPS AND ASSOCIATIONS

- Allegheny County Bar Association
- Pennsylvania Bar Association
- Society of Research Administrators International

## ACTIVITIES

- Duquesne Women's Law Association (Domestic Violence Committee Co-Chair, 2011-2012; Breast Cancer Awareness Committee Member 2009-2012)
- Energy & Mineral Law Society (2012)
- Mentor to First-Year Students Program (2011-2012)
- Participant in The Great Case Competition (October 2011), sponsored by the University of Pittsburgh Katz Graduate School of Business and School of Law
- Phi Alpha Delta Legal Fraternity

## PUBLICATIONS

- Bridget Noonan and Debra M. Parrish, "Image Manipulation as Research Misconduct," *Science and Engineering Ethics*, May 2009.

- Bridget Noonan and Debra M. Parrish, "Expressions of Concern and Their Uses," *Learned Publishing*, July 2008.

## SPEECHES AND PRESENTATIONS

- **"Beyond the Journals: Research Misconduct Outside of Academic Publications,"** 2017 Society of Research Administrators International Annual Meeting, Vancouver, CAN, October 16, 2017.

- **"The Basics of Research Misconduct Investigation Committees,"** 2016 Society of Research Administrators International Annual Meeting, San Antonio, TX, October 25, 2016.

- **"Landmark Research Misconduct Cases,"** 2016 Society of Research Administrators International Northeast/Southern Section Meeting, New York, NY, March 1, 2016.

- **"Research Misconduct: The Basics,"** 2015 Society of Research Administrators International Annual Meeting, Las Vegas, NV, October 21, 2015.

- **"Graduate Student Research Misconduct,"** 2015 Research Integrity Symposium, University of Southern Maine, May 22, 2015.

- **"Graduate Student Research Misconduct,"** Society of Research Administrators International Midwest/Northeast Section Meeting, Minneapolis, MN, April 28, 2014.

- **CLE topic "Recent Changes to the Federal Rules of Evidence and the Effect on the Pennsylvania**

**Rules of Evidence,"** Duquesne University School of Law Continuing Legal Education Project, Pittsburgh, PA, April 9, 2011.