IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROL A. LEWIS, and DOUGLAS B. SARGENT, on behalf of themselves and all others similarly situated, | Case No. 18-cv-2929 (RBW) |
| | JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| XAVIER BECERRA, in his capacity as Secretary of the United States Department of Health and Human Services, | |
| *Defendant.* | |

**CAROL LEWIS' AND DOUGLAS SARGENT'S
MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to FED.R.CIV.P. 65 and LCvR 65.1(c), Plaintiffs move for a preliminary injunction barring the Secretary from continuing to reject CGM claims based on CMS 1682-R and/or the claim that a CGM is not "primarily and customarily used to serve a medical purpose."

The Secretary's underlying position on which the claim denials in this case are based is in bad faith.  *See Olsen v. Becerra*, 2021 WL 3683360 (E.D. Wash. April 20, 2021) ("Defendant's conduct meets the 'high-threshold' for an award of bad-faith fees.") (cleaned up).  Beyond that, the denials themselves and the delay in the litigation resolving them evidence a deliberate indifference to human life and suffering.

Given the prospect of years of further litigation while the bad faith conduct continues and the Secretary enforces a Ruling whose application is barred by statute, Plaintiffs move for a preliminary injunction so that at least some fraction of the class members can receive relief while still living, without suffering blindness, etc.  Based on information produced by the Secretary, it is believed that ~13,000 claims are denied on the bad faith/illegal grounds each month.  A preliminary injunction will prevent tens of thousands of persons from continuing to suffer from the Secretary's bad faith misconduct.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND

As described in the attached declarations of Dr. Argento, diabetics (particularly Type I, "brittle" diabetics who also suffer from unawareness) are in danger of suffering from severe hypoglycemic events.  These events, in both the short and long term, cause irreparable injury in the form of injury to various systems of the body.  If not treated, in the short term, these events can lead to death.  In the long term, cumulatively, these events can lead to blindness, nerve damage leading to loss of limbs, kidney damage, and reduced cognitive function.  One purpose of a CGM

is to avoid these events by alerting users to out of range glucose values and, when combined with an insulin pump, controlling dispensed insulin.

In the period before January 2017, the Secretary frequently denied claims for CGM coverage on the grounds that CGMs were not "durable medical equipment" because they were not "primarily and customarily used to serve a medical purpose. This was so, the Secretary contends, because they were "precautionary" – a non-statutory/regulatory term.

Without prior notice and comment, on January 12, 2017, the Secretary issued CMS Ruling 1682-R. *See* Exhibit A to Pistorino Declaration. There, the Secretary maintained that any CGM which did not completely replace finger sticks was "precautionary" and not covered. *Id*. The Secretary asserted that if the reading from a CGM sensor had to be confirmed with a fingerstick prior to making a treatment decision, the CGM was not "primarily and customarily used to serve a medical purpose." *Id*.

Conversely, CGMs which do replace finger sticks the Secretary labeled "therapeutic" and considered covered. By its own terms, CMS 1682-R was effective as of the very date it issued – *i.e.*, January 12, 2017. *Id*. Pursuant to 42 C.F.R. § 405.1063, ALJs and the Medicare Appeals Council are bound by CMS Rulings and must apply them. Thus, any claim with a date of service after January 12, 2017, which does not match CMS 1682-R's definition of "therapeutic" must be rejected.

On December 13, 2018, the Complaint in this case was filed.

On November 4, 2020, the Secretary published a notice of proposed rule making to withdraw CMS 1682-R and cover CGM (*i.e.*, the very relief this suit was designed, in part, to achieve). As published, the proposed change was supposed to go into effect on April 1, 2021.

3

However, the Secretary never issued a notice of final rule making and has continued to reject claims based on CMS 1682-R.

On April 20, 2021, United States District Judge Salvador Mendoza found that the Secretary's denial of CGM claims on the grounds that a CGM is not "primarily and customarily used to serve a medical purpose" constituted "bad faith." *See Olsen*, 2021 WL 3683360 at *1-2. In addition, Judge Mendoza found that the Secretary's (specifically, Mr. Bickford's) effort in the litigation to change the basis for denial from not "primarily and customarily used to serve a medical purpose" to something based on alleged "accuracy" was in bad faith. *Id*. at *2. Likewise, Judge Mendoza found that the conduct of the litigation by Mr. Bickford was vexatious. *Id*. at *2, n. 1. Judge Mendoza's "bad faith" finding became final no later than June 21, 2021, when the Secretary did not appeal it.

Since Judge Mendoza became the fifth United States District Judge to reject the Secretary's position and also determined that the position was offered in bad faith, the Secretary has continued to reject claims on the frivolous grounds that a CGM is not "primarily and customarily used to serve a medial purpose" (including for lead plaintiff Douglas Sargent on **June 7, 2021**). Based on information produced by the Secretary reflecting claims denied through July 2019, Plaintiffs believe that ~13,000 claims are being denied on the improper basis each month.

Approximately half of those on Medicare have annual incomes of less than $30,000 and one quarter of Medicare enrollees have annual incomes of less than $17,000.[1] As shown in the

---

[1] https://www.kff.org/medicare/issue-brief/medicare-beneficiaries-financial-security-before-the-coronavirus-pandemic/

4

initial denial of CGM claims for both Mrs. Lewis (AR309) and Mr. Sargent (AR1935 and AR2187) a 90-day supply of CGM sensors costs ~$1,500 for a yearly cost of ~$6,000.[2]

## B.  LEGAL BACKGROUND

### 1.  Medicare's Notice and Comment Requirements

Pursuant to 42 U.S.C. § 1395hh(a)(2):

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

The "paragraph (1)" referred to requires the Secretary to issue such rules, requirements or other statements of policy in the form of regulations.

Pursuant to 42 U.S.C. § 1395hh(b)/(c), proposed regulations must be published in the FEDERAL REGISTER and the public provided no less than 60 days to comment on the proposed regulations before the regulations may be published as final regulations.

In *Azar v. Allina Health Services*, 139 S.Ct. 1804 (2019), the Supreme Court held that the Medicare specific notice and comment provisions (rather than the APA's notice and comment provisions) apply to Medicare. *Id*. at 1809.  Two differences between notice and comment under the Medicare Act and under the APA are: 1) the substantive/interpretive distinction under the APA does not apply to the Medicare Act; and 2) the Medicare Act requires 60 days of notice and comment rather than the 30 days under the APA.  Thus, under § 1395hh, no rule, requirement, or statement of policy that establishes or changes the standard for paying for services/benefits can take effect until the notice and comment provisions have been complied with.

---

[2] Depending on which device is prescribed, which components are needed, and the precise way they are paid for, the cost of the supplies can be as low as $3,000/year.

2.     **Preliminary Injunctions**

To obtain relief, a party seeking a preliminary injunction must show that: 1) they are "likely to succeed on the merits"; 2) the are "likely to suffer irreparable harm in the absence of preliminary relief"; 3) "the balance of equities is in their favor"; and 4) "an injunction is in the public interest." *See, e.g., Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). These factors are evaluated on a sliding scale, such that "if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-2 (D.C. Cir. 2009).

Where the federal government is the opposing party, the balance of equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Pursuant to FED.R.CIV.P. 65(c), "security in an amount that the court considers proper" may be required for the issuance of a preliminary injunction. The Rule has been read to "vest broad discretion in the district court to determine the amount of the injunction bond." *See DSE, Inc. v. U.S.*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes the discretion to set the bond amount at zero, *i.e.*, to require no bond at all. *See, e.g., Simms v. District of Columbia*, 872 F.Spp.2d 90, 107 (D.D.C. 2012) (Sullivan, J.); *Council on American-Islamic Relations v. Gaubatz*, 667 F.Supp.2d 67, 82 (D.D.C. 2009) (Kollar-Kotelly, J.) (waiving bond requirement). In considering the amount of security, the Court may consider the plaintiff's financial resources. *Id.*; *Swanson v. Univ. of Hawaii Prof. Assembly*, 269 F.Supp.2d 1252 (D. Hawaii 2003) (waiving bond requirement based, in part, on plaintiff's financial resources).

## II.     DISCUSSION

### A.     Plaintiffs Are Likely to Succeed on the Merits

In short, the causes of action in this case can be divided into two groups: 1) causes of action that go directly to the Secretary's denial of CGM claims on the grounds that a CGM is not "primarily and customarily used to serve a medical purpose"; and 2) Cause of Action V that goes to the illegal issuance of CMS 1682-R codifying the not "primarily and customarily used to serve a medical purpose" policy on which all claims since January 12, 2017 have been denied (including the claims submitted in the nearly three years this case has been pending – so far).

#### 1.     "Primarily and Customarily Used to Serve a Medical Purpose" Causes of Action

All the causes of action (except Cause of Action V) in this case are founded on the Secretary's rejection of CGM claims on the grounds that CGMs are not "durable medical equipment" (42 U.S.C. § 1935x(n)) because CGMs are not "primarily and customarily used to serve a medical purpose" (42 C.F.R. § 404.202). The causes of action assert that there is not substantial evidence to support the Secretary's position, it is arbitrary and capricious, etc.

There is not now nor has there ever been any good faith basis for the Secretary's position. Outside bad faith/frivolous rejections and litigation delay tactics founded on the same, no rational person could ever conclude that a CGM is not "primarily and customarily used to serve a medical purpose."

Before the *Olsen* case, four other district courts had already rejected the Secretary's assertion that a CGM is not "primarily and customarily used to serve a medical purpose" and also awarded fees to the plaintiffs in those cases. *See Whitcomb v. Azar*, Case No. 17-cv-14 (E.D. Wisc. Oct. 26, 2017) (Jones, J.), *Bloom v. Azar*, 2018 WL 583111 (D. Vt. January 29, 2018) (Crawford,

J.) and *Lewis v. Azar*, 2018 WL 1639687 (D. Mass. April 5, 2018) (Gorton, J.), and Zieroth v. Azar, 2020 WL 5642614 (N.D. Cal. Sept. 22, 2020) (Chesney, J.)

As noted above, in *Olsen*, the Court further determined that the Secretary position was frivolous/in bad faith as was the Secretary's conduct attempting to defend that position.

Plaintiffs are likely to succeed on the merits.

### 2. Cause of Action V

This cause of action goes to whether CMS 1682-R issued in compliance with the Medicare Act's specific notice and comment provisions (42 U.S.C. § 1395hh).

Without prior notice and comment (including publication in the FEDERAL REGISTER), CMS 1682-R issued on January 12, 2017, effective as of that very day. That was a violation of 42 U.S.C. § 1395hh. As stated in § 1395hh(2), "[n]o rule, requirement, or other statement of policy" that establishes or changes a standard concerning the scope of benefits, payment for services, etc. shall take effect unless promulgated by regulation issued in accordance with the notice and comment provisions. On its face, CMS 1682-R describes itself, *inter alia*, as a "statement[] of policy and interpretation." Exhibit A to Mot. at 1. Further, of course, by setting forth the standard of "precautionary" and "therapeutic" CGMs, CMS 1682-R purports to establish or change the standard concerning the scope of benefits, payment for services, or eligibility of individuals receiving a CGM. Thus, under § 1395hh, CMS 1682-R cannot "take effect unless it is promulgated by the Secretary by regulation" (including compliance with the notice and comment provisions). *See* 42 U.S.C. § 1395hh.

Here, there is no genuine issue of material fact that the Secretary did not comply with the notice and comment provisions. Nothing was published in the FEDERAL REGISTER concerning proposed regulations, there was no opportunity for the public to comment, and there was no

8

publication of final regulations.  *See* 42 U.S.C. § 1395hh(b).  Instead, in defiance of the statute, the Secretary simply issued a ruling establishing a new standard for benefits and, relying on that illegal standard, proceeded to reject claims (including Mr. Sargent's).  *See* AR974 ("We, like the ALJs, are bound by CMS Rulings.", *citing* 42 C.F.R. § 405.1063(b)).[3]  Thus, CMS 1682-R issued in violation of the law.[4]

Plaintiffs are likely to succeed on the merits.

**B.**     **Plaintiffs Will Suffer Irreparable Harm in the Absence of Preliminary Relief**

Of course, the ultimate irreparable harm is death.  By definition, the proposed class members are 65 years old or older and/or disabled and all suffer from diabetes.  The very purpose of a CGM is to prevent the injuries and death associated with uncontrolled diabetes.

As set forth in the attached declarations, the very purpose of a CGM is to avoid severe hypoglycemic events that cause irreparable damage to the body, including death.  Further, as shown, absent Medicare coverage, a very large portion of the Medicare beneficiaries would simply not be able to afford a CGM and, therefore, would suffer the irreparable harms associated with not having a CGM (e.g., death, blindness, loss of limbs, cognitive decline).

A simple example will suffice to demonstrate how a CGM helps avoid sever hypoglycemic events.  As set forth in the Complaint, prior to receiving a CGM, named plaintiff, Douglass Sargent had to be revived by paramedics more than 20 times as a result of undetected low blood sugar (*See*

---

[3] In this regard, 42 C.F.R. § 405.1063(b) indicates that CMS Rulings are "published" and further indicates that "consistent with 401.108", they are binding on "all CMS components, [and] on all HHS components that adjudicate matters under the jurisdiction of CMS[.]"  As set forth in 42 C.F.R. § 401.108(a), like 42 U.S.C. § 1395hh, it is contemplated that any such Rulings will be published in the FEDERAL REGISTER.  Here, again, it is undisputed that that did not occur.

[4] All denied claims with dates of service in this suit after January 12, 2017, were rejected based on CMS 1682-R.  This includes the absent class members and Mr. Sargent whose most recent rejection is dated June 7, 2021.

Dkt. #1 at ¶109). As set forth in the declarations, each one of these events resulted in some irreparable harm to Mr. Sargent (though, fortunately, none killed him).

As a practical matter, since receiving a CGM, Mr. Sargent has had no further incidents and, therefore, has not suffered the long-term damage and risk of death associated therewith. That the Secretary's bad faith conduct can be expected to continue is evidenced, *inter alia*, by the fact that since this case was filed Mr. Sargent has continued to receive denials of his CGM claims, including one dated **June 7, 2021**.

Unless the Secretary is enjoined from continuing to reject CGM claims on the bad faith, frivolous, illegal grounds that a CGM is not "primarily and customarily used to serve a medical purpose" the irreparable harm to some 13,000 persons each month will continue.

**C.   The Balance of Equities Favors Plaintiffs and an Injunction is in the Public Interest**

As noted above, where the federal government is the opposing party, the balance of equites and the public interest merge. *Nken*, 556 U.S. at 435.

In this case, Plaintiffs and the public have an interest in the laws passed by Congress being enforced. In addition, Plaintiffs have an interest in regulations adopted in accordance with the law being enforced. In addition, Plaintiffs have an interest in continuing to live and avoiding the permanent physical damage that results from each diabetic event. Thus, Plaintiffs have an interest in not going blind, keeping all of their limbs, etc.

Frankly, it is difficult to know what the equities or "interests" the Secretary has that are properly cognizable. The Secretary can have no legitimate interest in acting unlawfully or in "bad faith." Further, in light of the fact that the Secretary previously published his intention to withdraw the illegally issued CMS Ruling, the requested relief would simply order the Secretary to do what he has said he intends to do. Further, the sought after injunction will not require that claims are

approved – it will merely preclude the Secretary from denying claims on "bad faith"/illegal grounds. Thus, the balance of equites favor the Plaintiffs and an injunction is in the public interest.

**No Bond Should Be Required**

As noted above, this Court has discretion to set the bond at any amount, including requiring no bond at all. No bond should be required in this case.

The purpose of a bond is to compensate the enjoined party for harm if it is later determined that the injunction was improvidently granted. As an initial matter, no harm to the government would be associated with entry of the injunction. The injunction would not require approval of claims – it would merely preclude denial of claims on "bad faith"/illegal grounds. Thus, there is no harm to offset and no bond is needed.

In any event, by definition, the plaintiff class is made up of either elderly or disabled persons and, as indicated, at least half of the plaintiff class live on low or very low incomes. Thus, given their limited means to start with, no bond should be required.

Finally, no bond should be required to preclude the Secretary from engaging in conduct that has already been determined to be in "bad faith."

## CONCLUSION

For the reasons set forth above, this Court should enter an injunction barring the Secretary from: 1) rejecting CGM claims on the grounds that a CGM is not "primarily and customarily used to serve a medical purpose"; and 2) enforcing or otherwise giving effect to CMS 1682-R. Further, no bond should be required. A proposed order and injunction is attached.

Dated:  September 22, 2021                     Respectfully submitted,

                                               /s/Jeffrey Blumenfeld
                                               D.C. Bar No. 181768
                                               LOWENSTEIN SANDLER LLP
                                               2200 Pennsylvania Avenue, NW


Washington, DC 20037
Telephone: (202) 753-3800
Facsimile:  (202) 753-3838
jblumenfeld@lowenstein.com

*and*

PARRISH LAW OFFICES
James C. Pistorino
788 Washington Road
Pittsburgh, PA 15228
Telephone: (412) 561-6250
Facsimile:  (412) 561-6253
james@dparrishlaw.com

*Attorneys for Plaintiffs*

12