**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Part 414**

[CMS–1738–P]

RIN 0938–AU17

**Medicare Program; Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Policy Issues and Level II of the Healthcare Common Procedure Coding System (HCPCS)**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would establish methodologies for adjusting the Medicare durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) fee schedule amounts using information from the Medicare DMEPOS competitive bidding program for items furnished on or after April 1, 2021, or the date immediately following the duration of the emergency period described in section 1135(g)(1)(B) of the Social Security Act, whichever is later; application evaluation processes and other procedures related to Healthcare Common Procedure Coding System (HCPCS) Level II code applications; and procedures for making benefit category and payment determinations for new items and services that are durable medical equipment (DME), prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations under Medicare Part B. In addition, this rule proposes to classify continuous glucose monitors (CGMs) as DME under Medicare Part B and establish fee schedule amounts for these items and related supplies and accessories. Also, this proposed rule would expand the scope of the Medicare Part B benefit for DME by revising the interpretation of the ''appropriate for use in the home'' requirement in the definition of DME specifically for certain drugs or biologicals infused in the home using an external infusion pump. This proposed rule would also make conforming changes to the regulations related to implementation of section 106 of the Further Consolidated Appropriations Act, 2020.

**DATES:** To be assured consideration, comments must be received at one of the addresses specified in the **ADDRESSES** section, no later than 5 p.m. on January 4, 2021.

**ADDRESSES:** In commenting, please refer to file code CMS–1738–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1738–P, P.O. Box 8013, Baltimore, MD 21244–8010.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1738–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**

*DMEPOS@cms.hhs.gov* or Alexander Ullman, 410–786–9671, for issues related to the DMEPOS payment policy.

*HCPCS@cms.hhs.gov* or Kim Campbell, 410–786–2289, for issues related to HCPCS.

*HomeInfusionPolicy@cms.hhs.gov* for issues related to home infusion therapy services payment policy.

**SUPPLEMENTARY INFORMATION:** *Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following website as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that website to view public comments.

**I. Executive Summary**

*A. Purpose*

This proposed rule contains proposals related to the Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Fee Schedule Amounts to ensure access to items and services in rural areas, procedures for making benefit category and payment determinations for new items and services that are DME, prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations to prevent delays in coverage of new items and services, classification and payment for CGMs under the Part B benefit for DME to establish the benefit category and payment rules for these items, and the HCPCS Level II code application process to increase transparency and gather public input on proposed code application procedures. This proposed rule would expand the scope of the Medicare Part B benefit for DME by revising the interpretation of the ''appropriate use in the home'' requirement in the definition of DME at 42 CFR 414.202. External infusion pumps used to administer certain drugs or biologicals in the home would meet the definition of DME in cases where assistance in the patient's home from a skilled home infusion therapy supplier is necessary during the infusion and these home infusion therapy services are separately covered and paid for by Medicare under the home infusion therapy services benefit. This proposed rule would also make conforming changes to the regulations related to implementation of section 106 of the Further Consolidated Appropriations Act, 2020.

1. Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Fee Schedule Adjustments

The purpose of this proposal is to establish the methodologies for adjusting the fee schedule payment amounts for DMEPOS items and services furnished in non-competitive bidding areas (non-CBAs) on or after April 1, 2021 or the date immediately following the duration of the emergency period described in section 1135(g)(1)(B) of the Social Security Act (the Act) (42 U.S.C. 1320b–5(g)(1)(B)), whichever is later. The emergency period we are referring to is the Public Health Emergency (PHE) for coronavirus disease 2019 (COVID–19). We refer readers to section II.A.6. of this rule for details regarding the DMEPOS fee schedule changes CMS has already made as a result of the PHE for COVID–19. CMS previously established transition rules for phasing in the fee schedule adjustments under 42 CFR 414.210(g)(9), and these rules address the phase in of the fee schedule adjustments for items furnished through

Benefit category determination means a national determination regarding whether an item or service meets the Medicare definition of a prosthetic device at section 1861(s)(8) of the Act or is a splint, cast, or device used for reduction of fractures or dislocations subject to section 1842(s) of the Act and the rules of this subpart and is not otherwise excluded from coverage by statute.

We are also proposing procedures under new § 414.240 for determining whether new items and services meet the Medicare definition of items and services subject to the payment rules at 42 CFR part 414 subpart D. This would include determinations regarding whether the items and services are in the DME benefit category as defined at section 1861(n) of the Act and under 42 CFR 414.202. This would also include determinations regarding whether the items and services are in the benefit category for prosthetic devices that fall under section 1861(s)(8) of the Act other than PEN nutrients, equipment and supplies or IOLs inserted in a physician's office. This would also include determinations regarding whether the items and services are in the benefit category for leg, arm, neck, and back braces (orthotics), and artificial legs, arms, and eyes (prosthetics) under section 1861(s)(9) of the Act. This would also include determinations regarding whether the items and services are in the benefit category for surgical dressings under section 1861(s)(5) of the Act or custom molded shoes or extra-depth shoes with inserts for an individual with diabetes under section 1861(s)(12) of the Act. For the purpose of these proposed procedures and § 414.240, we are proposing to establish the following definition:

Benefit category determination means a national determination regarding whether an item or service meets the Medicare definition of durable medical equipment at section 1861(n) of the Social Security Act, a prosthetic device at section 1861(s)(8) of the Social Security Act, an orthotic or leg, arm, back or neck brace, a prosthetic or artificial leg, arm or eye at section 1861(s)(9) of the Social Security Act, is a surgical dressing, or is a therapeutic shoe or insert subject to sections 1834(a), (h), or (i) of the Act and the rules of this subpart and is not otherwise excluded from coverage by statute.

We are proposing that if a preliminary determination is made that a new item or service falls under one of the benefit categories for items and services paid in accordance with subparts C or D of 42 CFR part 414, then CMS will make a preliminary payment determination regarding how the fee schedule amounts for the item or services would be established in accordance with these subparts, and, for items and services identified as DME, under which of the payment classes under sections 1834(a)(2) through (7) of the Act the item or service falls. We are proposing that the procedures for making BCDs and payment determinations for new items and services subject to the payment rules under subparts C or D of 42 CFR part 414 would be made by CMS during each bi-annual coding cycle and the proposed procedures under new §§ 414.114 and 414.240 would include the following steps.

First, at the start of the coding cycle, an analysis is performed by CMS to determine if the item or service is statutorily excluded from coverage under Medicare under any of the provisions at section 1862 of the Act, and, if not excluded by statute, the analysis looks to see if the item or service falls under a Medicare benefit category defined in the statute and regulations for any of the items or services subject to the payment rules under subparts C or D of 42 CFR part 414. Information about the item or service from several sources is considered as part of this analysis such as the description of the item or service in the HCPCS application, HCPCS codes used to bill for the item or service in the past, product brochures and literature, information on the manufacturer's website, information related to the FDA clearance or approval of the item or service for marketing or related to items that are exempted from the 510(k) requirements or otherwise granted marketing authorization by the FDA. This step could take anywhere from 1-week to 1 or 2 months. For more complex items or services, the process may take several months, in which case public consultation on the benefit category and payment determinations would slip to a subsequent coding cycle.

Second, if a preliminary determination is made by CMS that the item or service is an item or service falling under a benefit category for items and services paid for in accordance with subpart C or D of 42 CFR part 414, a preliminary payment determination is made by CMS regarding how the fee schedule amounts will be established for the item or service and what payment class the item falls under if the item meets the definition of DME. This step could take anywhere from 1-week to 1 or 2 months. For more complex items or services, the process may take several months, in which case public consultation on the benefit category and payment determinations would slip to a subsequent coding cycle.

Third, approximately 4-months into the coding cycle, the preliminary benefit category and payment determinations are posted on *CMS.gov* 2-weeks prior to the public meeting described under § 414.8(d) in which CMS receives consultation from the public on the preliminary benefit category and payment determinations made for the item or service. After consideration of public consultation on any preliminary benefit category or payment determinations made for the item or service, the benefit category or payment determinations are established through program instructions issued to the Medicare Administrative Contractors.

It is important to note that even though a determination may be made that an item or service meets the Medicare definition of a benefit category, and fee schedule amounts may be established for the item or service, this does not mean that the item or service would be covered for a particular beneficiary. After a BCD and payment determination has been made for an item or service, a determination must still be made by CMS or the relevant local MAC that the item or service is reasonable and necessary for the treatment of illness or injury or to improve the functioning of a malformed body member, as required by section 1862(a)(1)(A) of the Act.

We seek public comment on our proposed process and procedures for making BCDs and payment determinations for new items and services paid for in accordance with subpart C or D of 42 CFR part 414. We note that our proposed approach does not affect or change our existing process for developing National Coverage Determinations (NCDs), which we can continue to use to develop NCDs both in response to external requests and internally-generated reviews. We further note that we are not limited to only addressing benefit categories in response to external HCPCS code applications and could decide to use the proposed process to address benefit categories in response to internally generated HCPCS coding changes as well.

## VI. Classification and Payment for Continuous Glucose Monitors Under Medicare Part B

This section addresses classification and payment for CGMs under the Medicare Part B benefit for DME. We are proposing to replace a Ruling issued in January of 2017 (CMS–1682–R) with this new rule.

*A. General Background*

DME is a benefit category under Medicare Part B, section 1861(n) of the Act defines "durable medical equipment" as including "iron lungs, oxygen tents, hospital beds, and wheelchairs (which may include a power-operated vehicle that may be appropriately used as a wheelchair, but only where the use of such a vehicle is determined to be necessary on the basis of the individual's medical and physical condition and the vehicle meets such safety requirements as the Secretary may prescribe) used in the patient's home (including an institution used as his home other than an institution that meets the requirements of subsection (e)(1) of this section or section 1819(a)(1)) of the Act, whether furnished on a rental basis or purchased, and includes blood-testing strips and blood glucose monitors for individuals with diabetes without regard to whether the individual has Type I or Type II diabetes or to the individual's use of insulin (as determined under standards established by the Secretary in consultation with the appropriate organizations) and eye tracking and gaze interaction accessories for speech generating devices furnished to individuals with a demonstrated medical need for such accessories; except that such term does not include such equipment furnished by a supplier who has used, for the demonstration and use of specific equipment, an individual who has not met such minimum training standards as the Secretary may establish with respect to the demonstration and use of such specific equipment. With respect to a seat-lift chair, such term includes only the seat-lift mechanism and does not include the chair."

In addition to this provision, in order to be covered, an item must meet the requirements of section 1862(a)(1)(A) of the Act, which precludes payment for any items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and section 1862(a)(6) of the Act, which precludes payment for personal comfort items.

The Medicare program was created as part of the Social Security Amendments of 1965 (Pub. L. 89–97), and the Part B benefit payments for DME were initially limited to "rental of durable medical equipment, including iron lungs, oxygen tents, hospital beds, and wheelchairs used in the patient's home (including an institution used as his home)" in accordance with the definition of DME at section 1861(s)(6) of the Act. The Social Security Amendments of 1967 (Pub. L. 90–248) amended the statute to allow for payment on a purchase basis for DME in lieu of rental for items furnished on or after January 1, 1968. Section 144(d) of the Social Security Amendments of 1967 changed the language under section 1861(s) of the Act to "durable medical equipment, including iron lungs, oxygen tents, hospital beds, and wheelchairs used in the patient' home (including an institution used as his home), whether furnished on a rental basis or purchased." Payments for purchase of expensive items of DME were limited to monthly installments equivalent to what would have otherwise been made on a rental basis, limited to the period of medical need and not to exceed the purchase price of the equipment.

In 1975, Medicare program instructions in section 2100 of chapter 2 of part 3 of the Medicare Carrier's Manual (HCFA Pub. 14–3) indicated that expenses incurred by a beneficiary for the rental or purchase of DME are reimbursable if the following three requirements are met: The equipment meets the definition of DME in this section; and the equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his malformed body member; and the equipment is used in the patient's home. The instructions also indicated that payment may also be made under the DME benefit category for repairs and maintenance of equipment owned by the beneficiary as well as expendable and non-reusable supplies and accessories essential to the effective use of the equipment. DME was defined under these program instructions from 1975 as equipment meeting four requirements (quoted later in the section verbatim and with text underscored as in the original instructions):

Durable medical equipment is equipment which (a) can withstand repeated use, *and* (b) is primarily and customarily used to serve a medical purpose, *and* (c) generally is not useful to a person in the absence of an illness or injury; and (d) is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be durable medical equipment.

Additional detailed instructions were provided in 1975 describing the underlying policies for determining whether an item meets the definition of DME and specifically addressed what the terms "durable" and "medical equipment" mean. The instructions indicated that an item is considered durable if it can withstand repeated use, that is, it is the type of item that could normally be rented, and that medical supplies of an expendable nature are not considered "durable" within the meaning of the definition. In order to be considered DME, the item must be able to be rented out to multiple patients and thus withstand repeated use. The instructions indicated that medical equipment is equipment primarily and customarily used for medical purposes and is not generally useful in the absence of illness or injury. The instructions indicated that in some cases information from medical specialists and the manufacturer or supplier of products new to the market may be necessary to determine whether equipment is medical in nature. Additional instructions provide examples of equipment which presumptively constitutes medical equipment, such as canes, crutches, and walkers, and equipment that is primarily and customarily used for a nonmedical purpose and cannot be considered DME even when the item has some remote medically related use, such as air conditioners. Equipment that basically serves comfort or convenience functions or is primarily for the convenience of a person caring for the patient, such as elevators, and posture chairs, do not constitute medical equipment. Similarly, physical fitness equipment, first-aid or precautionary-type equipment, self-help equipment, and training equipment are considered nonmedical in nature. These program instructions from 1975 are still in effect and are now located in section 110 of chapter 15 of the Medicare Benefits Policy Manual (CMS Pub. 100–02).

The Social Security Amendments of 1977 (Pub. L. 95–142) amended the statute to mandate a "rent/purchase" program or payment methodology for DME; CMS would pay for each item furnished to each beneficiary on either a rental or purchase basis depending on which method was considered more economical. The decision regarding whether payment for DME was made on a rental or purchase basis was made by the Medicare Part B carrier (Medicare contractor) processing the claim. The rent/purchase program was implemented from February 1985 through December 1988.

Section 2321 of the Deficit Reduction Act of 1984 (Pub. L. 98–369) moved the definition of DME from section 1861(s)(6) of the Act to section 1861(n) of the Act and included a more detailed definition of DME.

Section 4062(b) of the Omnibus Budget Reconciliation Act (OBRA) of

1987 (Pub. L. 100–203) amended the statute to terminate the rent/purchase program and add section 1834(a) to the Act with special payment rules for DME furnished on or after January 1, 1989. DME items were to be classified into different classes under paragraphs (2) through (7) of section 1834(a) of the Act, with specific payment rules for each class of DME. Section 1834(a) of the Act still governs payment for items and services furnished in areas that are not included in the competitive bidding program mandated by section 1847(a) of the Act. Section 1834(a)(2) of Act indicates that payment is made on a rental basis or in a lump sum amount for the purchase of an item the purchase price of which does not exceed $150 (inexpensive equipment) or which the Secretary determines is acquired at least 75 percent of the time by purchase (routinely purchased equipment) or which is an item specified under sections 1834(a)(2)(A)(iii) and (iv) of the Act. The term ''routinely purchased equipment'' is defined in regulations at 42 CFR 414.220(a)(2) as equipment that was acquired by purchase on a national basis at least 75 percent of the time during the period July 1986 through June 1987.

Medicare began covering blood glucose monitors under the DME benefit in the early 1980s and the test strips and other supplies essential for the effective use of the glucose monitor were also covered. Blood glucose monitors were expensive equipment within the meaning of section 1834(a)(2) of the Act but were routinely purchased (more than 75 percent of the time on a national basis) during the period July 1986 through June 1987. Therefore, payment was made on a fee schedule basis for blood glucose monitors based on the lower of the supplier's actual charge for the item or a state-wide fee schedule amount calculated for the item based on the average rental or purchase payment for the item in the state for the 12-month period ending on June 30, 1987. The rental and purchase fee schedule amounts are increased on an annual basis based on the provisions set forth in section 1834(a)(14) of the Act.

The special payment rules for DME mandated by section 1834(a) of the Act were implemented via program instructions for all DME items other than oxygen and oxygen equipment on January 1, 1989. CMS established and implemented fee schedule amounts for inexpensive or routinely purchased items, for payment on a rental basis, payment on a lump sum purchase basis when the item is new, and payment on a lump sum purchase basis when the item is used. We also promulgated rules implementing the special payment rules for DME mandated by section 1834(a) of the Act. For more information, see the October 9, 1991 and December 7, 1992 **Federal Registers** (56 FR 50821 and 57 FR 57675, respectively), and a July 10, 1995 final rule (60 FR 35492).

We established a definition for DME items and services during this time at 42 CFR 414.202, which simply mirrored the general definition of DME established in 1975 via program instructions.

Section 1861(n) of the Act was revised by section 4105(b)(1) of the Balanced Budget Act of 1997 (Pub. L. 105–33) to expand coverage of blood glucose monitors and test strips to patients with type II diabetes. As noted, these items had already been covered as DME (glucose monitoring equipment) and disposable supplies (test strips) since the early 1980s, but coverage was limited to patients with type I diabetes.

We added to the definition of DME at 42 CFR 414.202 effective for items furnished after January 1, 2012, to require that the item have a minimum lifetime of 3 years in order to be considered DME. This 3 year minimum lifetime requirement was established in a final rule published in the November 10, 2011 **Federal Register** entitled: Medicare Program; End-Stage Renal Disease Prospective Payment System and Quality Incentive Program; Ambulance Fee Schedule; Durable Medical Equipment; and Competitive Acquisition of Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (76 FR 70228 and 70314). This final rule included a discussion of how the 3-year minimum lifetime requirement (MLR) is applied to multicomponent devices or systems consisting of durable and nondurable components (76 FR 70291). In this rule, we noted that a device may be a system consisting of durable and nondurable components that together serve a medical purpose, and that we consider a multicomponent device consisting of durable and nondurable components nondurable if the component that performs the medically necessary function of the device is nondurable, even if other components that are part of the device are durable. In regards to the 3-year MLR, the component(s) of a multicomponent device that performs the medically necessary function of the device must meet the 3-year MLR (76 FR 70291).

In summary, DME is covered under Medicare Part B. DME is defined under section 1861(n) of the Act and Medicare claims for DME are paid in accordance with the special payment rules under section 1834(a) of the Act or under the competitive bidding program mandated by sections 1847(a) and (b) of the Act. Rules related to the scope and conditions of the benefit are addressed at 42 CFR 410.38. Under § 414.202, durable medical equipment means equipment which—

• Can withstand repeated use;
• Effective with respect to items classified as DME after January 1, 2012, has an expected life of at least 3 years;
• Is primarily and customarily used to serve a medical purpose;
• Generally is not useful to a person in the absence of an illness or injury; and
• Is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be DME.

*B. Continuous Glucose Monitors*

On January 12, 2017, CMS issued CMS–1682–R articulating the CMS policy concerning the classification of continuous glucose monitoring systems as DME under Part B of the Medicare program. CMS–1682–R is available on the *CMS.gov* website at: *https://www.cms.gov/Regulations-and-Guidance/Guidance/Rulings/CMS-Rulings*.

CMS–1682–R classified continuous glucose monitoring systems as ''therapeutic continuous glucose monitors (CGMs)'' that meet the definition of DME if the equipment—

• Is approved by FDA for use in place of a blood glucose monitor for making diabetes treatment decisions (for example, changes in diet and insulin dosage);
• Generally is not useful to the individual in the absence of an illness or injury;
• Is appropriate for use in the home; and
• Includes a durable component (a component that CMS determines can withstand repeated use and has an expected lifetime of at least 3 years) that is capable of displaying the trending of the continuous glucose measurements.

Under CMS–1682–R, in all other cases in which a CGM does not replace a blood glucose monitor for making diabetes treatment decisions, a CGM is not considered DME. CMS–1682–R also addressed the calculation of the fee schedule amounts for therapeutic CGMs in accordance with the rules at section 1834(a) of the Act and under regulations at 42 CFR, part 414, subpart D.

CGMs are systems that use disposable glucose sensors attached to the patient to monitor a patient's glucose level on a continuous basis by either automatically transmitting the glucose readings from the sensor via a

transmitter to a device that displays the readings (''automatic'' CGMs), or by displaying the glucose readings from the sensor on a device that the patient manually holds over the sensor (''manual'' CGMs). Some CGMs are class III devices and require premarket approval by FDA, while some newer CGM models are class II devices that do not require premarket approval by FDA. The glucose sensor continuously measures glucose values in the interstitial fluid, the fluid around the cells (in contrast to blood glucose monitors which measure glucose values using fingertip blood samples). The sensor is a small flexible metal probe or wire that is inserted in the skin and has a coating that prevents the body's immune system from detecting and attacking the foreign probe. Once the coating wears off, which in current models takes place in 7 to 14 days, the sensor must be replaced for safety reasons. The glucose sensor generates a small electrical signal in response to the amount of sugar that is present (interstitial glucose). This electrical signal is converted into a glucose reading that is then displayed on a dedicated receiver (or type of monitor), an insulin infusion pump, or a compatible mobile device (smart phone, smart watch, tablet, etc.). The receiver displays the glucose measurements in the form of a graph so that the patient can visualize how their glucose measurements are trending.

CMS–1682–R classifies CGM display devices as DME if they have been approved by FDA for use in making diabetes treatment decisions, such as changing one's diet or insulin dosage based solely on the readings of the CGM, that is, without verifying the CGM readings with readings from a blood glucose monitor. These CGMs are referred to as ''non-adjunctive'' or ''therapeutic'' CGMs in CMS–1682–R. In contrast, CGMs that a patient uses to check their glucose levels and trends that must be verified by use of a blood glucose monitor in order to make diabetes treatment decisions are not currently classified as DME. These CGMs are referred to as ''adjunctive'' or ''non-therapeutic'' CGMs in CMS–1682–R.

*C. Current Issues*

Beneficiaries are continuing to use adjunctive or ''non-therapeutic'' CGMs to help manage their diabetes, and claims submitted for this equipment and its related supplies and accessories are being denied in accordance with CMS–1682–R. We believe classification of CGMs in general is an important issue to address again in notice and comment rulemaking. In this proposed rule we revisit the question of whether CGMs (both adjunctive and non-adjunctive), and their accessories and supplies meet the five requirements or prongs of the definition of DME at 42 CFR 414.202.

1. Requirements of DME Definition

(a) Ability To Withstand Repeated Use

As discussed in CMS–1682–R, we view the receiver that converts the glucose readings from the disposable sensors and displays the readings in a graph showing the continuous change in the trend of glucose levels as the CGM component that performs the primary medical function of self-monitoring of glucose levels and that therefore, the receiver is the component that must be durable or withstand repeated use in order for the CGM as a whole to be classified as DME. The receiver for all CGM systems (both adjunctive and non-adjunctive) can be rented and used by successive patients to monitor the trending of glucose levels that are either transmitted to the device using disposable sensors or are read or received by the device when the patient holds the device near the sensor. Therefore, we believe this equipment meets the requirement to withstand repeated use; that is, equipment that could normally be rented and used by successive patients.

(b) Expected Life of at Least 3 Years

This criterion under 42 CFR 414.202 further addresses the issue of ''durability'' and provides a clear minimum timeframe for how long an item must last in order to meet the definition of DME. As noted previously, for multicomponent equipment (that is, a system of durable and nondurable components), the component that performs the medically necessary function of the equipment must be durable in order for the device to be considered DME. The blood glucose monitor reads the glucose level on the test strip and displays the reading for the patient. CGM receivers operate in a similar fashion and, unlike the glucose sensor component, which must be replaced every 7 to 14 days, we believe the receiver does meet the 3-year minimum lifetime requirement. In the case of one manufacturer, reliability analysis data from an engineering firm that evaluated the receiver component of the CGM system predicted a lifetime of greater than 3 years for the receiver. Therefore, we believe that the receiver, both for adjunctive and non-adjunctive CGMs, has an expected life of at least 3 years.

(c) Primarily and Customarily Used To Serve a Medical Purpose

As noted previously, in CMS–1682–R, we concluded that adjunctive CGMs are not primarily and customarily used to serve a medical purpose. We are proposing to change our determination with regard to whether adjunctive CGMs are primarily and customarily used to serve a medical purpose. The agency's determination that devices like these are not primarily and customarily used to serve a medical purpose has been rejected by several district courts. The district courts hearing these cases have rejected the determination that adjunctive CGMs are not primarily and customarily used to serve a medical purpose. *See, e.g., Finigan* v. *Burwell,* 189 F. Supp. 3d 201 (D. Mass. 2016); *Whitcomb* v. *Hargan,* Case No. 17–cv–14, 2017 U.S. Dist. LEXIS 216571 (E.D. Wis. Oct. 26, 2017); *Lewis* v. *Azar,* 308 F. Supp. 3d 574 (D. Mass. 2018).

CGMs are used by patients to monitor their glucose levels, which can help them to manage their diabetes and make diabetes treatment decisions such as determining what and when to eat and changes in insulin dosage. We are proposing that CGM systems that have not been approved by FDA for use in making these diabetes treatment decisions without the use of a blood glucose monitor but can be used to alert the patient about potentially dangerous glucose levels while they sleep, are primarily and customarily used to serve a medical purpose. We now believe that because adjunctive CGMs can provide information about potential changes in glucose levels while a beneficiary is sleeping and is not using a blood glucose monitor, these CGMs are primarily and customarily used to serve a medical purpose. Specifically, these CGMs serve a medical purpose by helping patients to avoid potential episodes of hypoglycemia or hyperglycemia, despite the fact that fingerstick blood glucose verification is still required for use in making diabetes treatment decisions. Currently, Medicare does not cover adjunctive CGMs because such CGMs are not DME, per CMS–1682–R. CMS is proposing to change this policy issued under CMS–1682–R; all CGMs (adjunctive and non-adjunctive) would be considered DME, effective April 1, 2021.

(d) Generally Not Useful to a Person in the Absence of an Illness or Injury

CMS has determined that both adjunctive and non-adjunctive/therapeutic CGM systems are generally not useful to a person in the absence of an illness or injury because people who do not have diabetes generally would

not find a monitor that tracks their glucose levels to be useful. Thus far, Medicare's coverage policy for CGMs has supported the use of therapeutic CGMs in conjunction with a smartphone (with the durable receiver as backup), including the important data sharing function they provide for patients and their families.[41] CMS previously concluded that therapeutic CGMs, when used in conjunction with a smartphone, still satisfied the definition of DME because the durable receiver, used as a backup, was generally not useful to a person in the absence of an illness or injury, even if the smartphone might be. CMS is now proposing that both therapeutic and non-therapeutic CGMs, when used in conjunction with a smartphone, satisfy the definition of DME because the durable receiver, used as a backup, is not generally useful to a person in the absence of an illness or injury. Medicare does not cover or provide payment for smartphones under the DME benefit. In order for Medicare to cover disposable glucose sensors, transmitters and other non-durable components of a CGM system, these disposable items must be used with durable CGM equipment that meets the Medicare definition of DME. If a Medicare beneficiary is using durable CGM equipment that meets the Medicare definition of DME, but also uses a smartphone or other non-DME device to display their glucose readings in conjunction with the covered DME item as described previously, Medicare will cover the disposable items since the beneficiary is primarily using their covered DME item to display their glucose readings. However, if the beneficiary is exclusively using a non-DME item like a smartphone to display glucose readings from disposable sensors, transmitters or other disposable CGM supplies, these disposable supplies cannot be covered since there is no covered item of DME in this scenario.

(e) Appropriate for Use in the Home

FDA has cleared or approved CGM systems as safe and effective for use by the patient in their homes similar to how blood glucose monitoring systems have been used in the home for many years. Both adjunctive and non-adjunctive CGMs are appropriate for use in the home for the same purpose that a blood glucose monitor is used in the home.

---

[41] https://www.cms.gov/Center/Provider-Type/Durable-Medical-Equipment-DME-Center.

2. Fee Schedule Amounts for CGM Receivers/Monitors and Related Accessories

Medicare payment for DME was made on a reasonable charge basis prior to 1989. The regulations related to implementation of the reasonable charge payment methodology are found at 42 CFR part 405, subpart E. The current Medicare payment rules for glucose monitors and other DME are located at section 1834(a) of the Act and mandate payment on the basis of fee schedule amounts beginning in 1989. Blood glucose monitors are classified as routinely purchased items subject to the payment rules for inexpensive and routinely purchased DME at section 1834(a)(2) of the Act, which mandate payment for routinely purchased items on a purchase or rental basis using fee schedule amounts based on average reasonable charges for the purchase or rental of the item for the 12-month period ending on June 30, 1987, increased by the percentage increase in the consumer price index for all urban consumers (U.S. city average) for the 6-month period ending with December 1987. These base fee schedule amounts are increased on an annual basis based on the update factors located in section 1834(a)(14) of the Act, which includes specific update factors for 2004 through 2008 for class III devices described in section 513(a)(1)(C) of the Federal Food, Drug, and Cosmetic Act. Routinely purchased equipment is defined in the regulations at 42 CFR 414.220(a)(2) as "equipment that was acquired by purchase on a national basis at least 75 percent of the time during the period July 1986 through June 1987." Section 1834(a)(1)(C) of the Act states that "subject to subparagraph (F)(ii), this subsection must constitute the exclusive provision of this title [Title XVIII of the Act] for payment for covered items under this part [Medicare Part B] or under Part A to a home health agency." The fee schedule amounts for blood glucose monitors were revised in 1995 using special payment limits established in accordance with the "inherent reasonableness" authority at section 1842(s)(8) of the Act. The final notice (BPD–778–FN) establishing special payment limits for blood glucose monitors was published in the January 17, 1995 **Federal Register** (60 FR 3405), with the payment limits updated on an annual basis using the DME fee schedule update factors in section 1834(a)(14) of the Act.

Because certain CGMs have been granted marketing authorization by FDA to replace blood glucose monitors for use in making diabetes treatment decisions, we believe that CGMs represent a newer technology version of glucose monitors paid for by Medicare in 1986 and 1987. In addition, the CGM systems function similar to the blood glucose monitors in using disposable supplies or accessories, such as test strips or sensors, to measure glucose levels in a patient's body, either from the patient's blood or interstitial fluid, and using durable equipment to convert these glucose measurements in a way that they can be displayed on a screen on the equipment. Therefore, we believe that the CGM receivers/monitors must be classified as routinely purchased DME since they are a technological refinement of glucose monitors routinely purchased from July 1986 through June 1987. The alternative would be to classify CGM receivers/monitors as other items of DME under section 1834(a)(7) of the Act and pay for the equipment on a capped rental basis. We also believe the average reasonable charge data for blood glucose monitors from 1986 and 1987 can be used to establish the fee schedule amounts for CGM receivers/monitors in accordance with our regulations 42 CFR 414.238(b) since CGM receivers/monitors are comparable to blood glucose monitors. We do not believe that the special payment limits established in 1995 for blood glucose monitors must apply to CGM receivers/monitors because these special payment limits were based on specific pricing information on the cost of blood glucose monitors. We therefore propose to continue using the fee schedule amounts established in CMS–1682–R based on the updated 1986/87 average reasonable charges for blood glucose monitors as the fee schedule amounts for CGM receivers/monitors. As noted, section 1834(a)(14) of the Act provides different annual update factors for class III DME versus other DME items and so the fee schedule amounts for class III CGM receivers are slightly higher (from $231.77 to $272.63 in 2020) than the fee schedule amounts for class II CGM receivers (from $208.76 to $245.59 in 2020).

With regard to the fee schedule amounts for supplies and accessories for CGMs, we do not believe these supplies and accessories are comparable to the supplies and accessories for blood glucose monitors, and there is a significant difference in the cost, lifetimes, and types of supplies and accessories used with the various types of CGMs. Namely, some sensors last for 7 days while others last for 14 days, some CGM systems require certain additional accessories such as transmitters or additional supplies such

as calibration supplies while others do not. We believe all CGM receivers essentially serve the same purpose as a blood glucose monitor in interpreting and displaying glucose levels from disposable supplies. However, the disposable supplies for CGMs are very different from the disposable supplies used with a blood glucose monitor, so we do not believe that the 1986/87 average reasonable charges for supplies used with a blood glucose monitor should be used to establish the fee schedule amounts for supplies used with a CGM. In addition, the supplies used with the three types of CGMs currently on the market are also very different. For this reason, we are proposing to separate payment for CGM supplies and accessories into three separate categories of supplies and accessories with different fee schedule amounts for each category. The current 2020 monthly fee schedule amounts of $222.77 and $259.20 for supplies and accessories for CGM systems apply to all types of class II or class III CGMs, respectively, but were established based on supplier price lists for only one type of CGM system approved by FDA for use in making diabetes treatment decisions without the need to use a blood glucose monitor to verify the results (non-adjunctive CGMs). The supplier prices used to establish these fee schedule amounts were for non-adjunctive CGM systems that use a combination of sensors and transmitters to automatically send glucose measurements to the CGM receiver without manual intervention by the patient. We refer to this type of CGM system as a non-adjunctive system, or a system that both replaces a blood glucose monitor for use in making diabetes treatment decisions, and can alert the patient about dangerous glucose levels while they sleep based on the automatic transmission of the glucose readings to the receiver on a 24-hour basis. The fee schedule amounts of $222.77 and $259.20 for supplies and accessories for class II and class III CGMs, respectively, increased by the fee schedule update factor for 2021, would continue to apply to the supplies and accessories for automatic, non-adjunctive CGMs effective April 1, 2021.

As aforementioned, adjunctive and ''non-therapeutic'' CGMs also work with disposable batteries, sensors, and transmitters to automatically send glucose readings to the receiver on a 24-hour basis, but have not been granted marketing authorization for use in place of a blood glucose monitor. As such, if a beneficiary uses one of these CGMs, the beneficiary and program would still incur expenses associated with use of blood glucose monitors and supplies. To avoid a situation where the beneficiary and program would pay twice for glucose monitoring supplies needed to accurately assess glucose levels, we propose to establish the fee schedule amounts for supplies and accessories for adjunctive CGMs based on supplier prices for the sensors and transmitters minus the fee schedule amounts for the average quantity and types of blood glucose monitoring supplies used by insulin-treated beneficiaries who would be more likely to qualify for coverage of a CGM system based on a need to more closely monitor changes in their glucose levels. The adjunctive CGM system is not replacing the function of the blood glucose monitor and related supplies and therefore only provides an adjunctive or added benefit of alerting the beneficiary when their glucose levels might be dangerously high or low. Since the adjunctive CGM system cannot function alone as a glucose monitor for use in making diabetes treatment decisions, we are proposing to reduce the payment for the adjunctive CGM system by the amount that is paid separately for the blood glucose monitor and supplies that are needed in addition to the adjunctive CGM system and are not needed in addition to the non-adjunctive CGM systems. Currently, Medicare is allowing coverage and payment for 135 test strips and lancets per month for insulin-treated beneficiaries using blood glucose monitors. Using the 2020 mail order fee schedule amounts for 50 test strips, divided by 50 and multiplied by 135, plus the 2020 mail order fee schedule amounts for 100 lancets, divided by 100 and multiplied by 135, plus the 2020 mail order fee schedule amounts for a monthly supply of batteries, calibration solution, and lancet device, plus the 2020 fee schedule amount for the blood glucose monitor divided by 60 months (5-year lifetime) results in a 2020 monthly allowance of $34.35, which reflects what Medicare currently pays per month for an insulin-treated diabetic beneficiary. Based on supplier invoices and other prices, a 2020 monthly price for supplies and accessories used with class II or class III adjunctive CGMs would be calculated to be $209.97 and $233.12 respectively. Subtracting the monthly cost of the blood glucose monitor and supplies of $34.35 from the monthly cost of the supplies and accessories for class II adjunctive CGMs results in a net price of $175.62 ($209.97 − $34.35 = $175.62) for the monthly supplies and accessories used with a class II adjunctive CGM after backing out the cost of the separately paid blood glucose supplies. Subtracting the monthly cost of the blood glucose monitor and supplies of $34.35 from the monthly cost of the supplies and accessories for class III adjunctive CGMs results in a net price of $198.77 ($233.12 − $34.35 = $198.77) for the monthly supplies and accessories used with a class III adjunctive CGM after backing out the cost of the separately paid blood glucose supplies. Thus we are proposing 2020 fee schedule amounts of $175.62 and $198.77 (to be increased by the 2021 fee schedule update factor yet to be determined) for use in paying claims in 2021 for the monthly supplies and accessories for use with class II and class III adjunctive CGMs respectively. Reducing the payment amount for supplies and accessories used with adjunctive CGMs by the average monthly payment for the blood glucose monitor and supplies that Medicare and the beneficiary will still have to pay for avoids a situation where the beneficiary and the program pay twice for glucose testing supplies and equipment.

Finally, a third type of CGM system currently on the market is non-adjunctive but does not automatically transmit glucose readings to the CGM receiver and therefore does not alert the patient about dangerous glucose levels while they sleep. We refer to this as a manual, non-adjunctive CGM system. We propose to establish 2020 fee schedule amounts of $46.86 (for class II devices) and $52.01 (for class III devices) for the monthly supplies and accessories for this third category, which only uses disposable batteries and sensors, based on supplier prices for the supplies and accessories for this category of CGMs.

Again, we believe that the types of CGM supplies and accessories used with the three different types of CGM systems currently on the market warrants three separate fee schedule amounts for the different monthly supplies and accessories for these three types of systems.

### C. Provisions of the Proposed Rule

We are proposing to classify all CGM systems that use a receiver that meets the definition of DME as DME. We are proposing that a CGM system would need to be granted marketing authorization by FDA, but its FDA-required labeling would not need to indicate that the CGM is appropriate or indicated for use in place of a blood glucose monitor for making diabetes treatment decisions in order to be classified as DME. Therefore, we are now proposing to classify CGM systems

that are adjunctive and non-adjunctive as DME. We are also proposing to establish Medicare fee schedule amounts for CGM receivers/monitors using 1986/87 average reasonable charges for comparable blood glucose monitors updated in accordance with section 1834(a)(14) of the Act. Finally, we propose to establish separate monthly fee schedule amounts for calendar year 2021 for the supplies and accessories used with the three different types of class II and class III CGMs on the market as of the date of publication of this proposed rule based on the following amounts with the addition of the applicable update factors for 2021 to be determined later this year: $222.77 (class II) and $259.20 (class III) for supplies and accessories necessary for the effective use of automatic, non-adjunctive CGMs; $175.62 (class II) and $198.77 (class III) for supplies and accessories necessary for the effective use of automatic, adjunctive CGMs; and $46.86 (class II) and $52.01 (class III) for supplies and accessories necessary for the effective use of manual, non-adjunctive CGMs.

## VII. Expanded Classification of External Infusion Pumps as DME

In section 5012 of the 21st Century Cures Act, Congress amended section 1861(s)(2) of the Act, and added subsections 1834(u) and 1861(iii) of the Act, to establish a new Medicare home infusion therapy services benefit to cover certain professional services associated with the provision of home infusion therapy. Congress defined ''home infusion drug[s]'' at section 1861(iii)(3)(C) of the Act as ''a parenteral drug or biological administered intravenously, or subcutaneously for an administration period of 15 minutes or more, in the home of an individual through a pump that is an item of durable medical equipment (as defined in subsection (n)),'' excluding insulin pump systems and self-administered drugs or biologicals on a self-administered drug exclusion list. See 42 U.S.C. 1395x(iii)(3)(C).

In light of the new Medicare home infusion therapy services benefit to cover certain professional services associated with the provision of home infusion therapy, we propose to expand the scope of the Medicare Part B benefit for durable medical equipment (DME) by revising the interpretation of the ''appropriate for use in the home'' requirement within the definition of DME at 42 CFR 414.202 specifically for certain drugs or biologicals infused in the home using an external infusion pump. It is important to note that the home infusion therapy benefit is only available when a drug or biological is administered through an external infusion pump that is an item of DME. In addition, drugs or biologicals administered through an external infusion pump that is an item of DME can be covered under the Medicare Part B benefit for DME as supplies necessary for the effective use of the external infusion pump.

In order for an external infusion pump and associated supplies to be covered under the Part B DME benefit, the pump must, among other statutory and regulatory requirements, be ''appropriate for use in the home.'' See 42 CFR 414.202. In practice, CMS has interpreted this requirement within the definition of DME at 42 CFR 414.202 as limiting coverable DME items to those items which can be used by a patient or caregiver in the home without the assistance of a healthcare professional. We propose to interpret this requirement to be met for an external infusion pump if: (1) The Food and Drug Administration (FDA)-required labeling requires the associated home infusion drug to be prepared immediately prior to administration or administered by a health care professional or both; (2) a qualified home infusion therapy supplier (as defined at § 486.505) administers the drug or biological in a safe and effective manner in the patient's home (as defined at § 486.505); and (3) the FDA-required labeling specifies infusion via an external infusion pump as a possible route of administration, at least once per month, for the drug. We will use the first requirement in our proposed standard to identify the drugs or biologicals that a beneficiary or caregiver or both is unable to safely and effectively administer in the home, per the FDA-required labeling. The second requirement addresses the necessary services furnished by a qualified home infusion therapy supplier, which are covered by Medicare under the home infusion therapy benefit, and which would provide for the safe and effective administration of the drug or biological in the home. Our justification for the third requirement in our proposed standard is based on our belief that the FDA-required labeling must specify that a drug may be infused via an external infusion pump on a regular basis or over a set period of time at prescribed intervals because DME is a rental benefit. Medicare payment for an external infusion pump classified as DME is typically made over the course of 13 months under a capped rental payment; title for the pump transfers to the beneficiary after 13 months of continuous use. Medicare payment for drugs or biologicals infused through an item of DME is typically made consistent with section 1847A of the Act. Therefore, we propose that in a situation in which a beneficiary or caregiver or both is unable to safely and effectively administer certain drugs or biologicals, the external infusion pump through which such drugs or biologicals are administered could satisfy the definition of DME if all three of the requirements described previously are met. The drug or biological could then be covered as a supply under the DME benefit.

Related to the third requirement in our proposed standard, we are seeking comment on our proposed plan to take into account whether the FDA required labeling specifies infusion via an external infusion pump as a possible route of administration, at least once per month, for the drug; we welcome input on alternative standards or factors DME MACs could use when making this determination.

If finalized, the proposed change would result in a greater number of drugs or biologicals being covered as supplies under the DME benefit. The proposed change could also affect home infusion therapy services. We solicit comments on our proposal to reinterpret the ''appropriate for use in home'' requirement at 42 CFR 414.202, which would expand beneficiary access to drugs or biologicals infused in the home using and external infusion pump.

In particular, we solicit comment on whether our proposal would be adequate to expand access to medically appropriate home infusion drugs administered through external infusion pumps and home infusion therapy furnished by qualified home infusion therapy suppliers. We note that in order to receive services under the Medicare home infusion therapy benefit, section 1861(iii)(2)(B) of the Act requires the individual to be under a plan of care that describes the type, amount, and duration of home infusion therapy services and such plan must be established and reviewed by a physician in coordination with the furnishing of home infusion drugs. Therefore, the patient's physician must coordinate, as needed, with the DME supplier and a qualified home infusion therapy supplier (if different from the DME supplier) when establishing and reviewing the home infusion therapy plan of care. Additionally, we solicit public comment with regard to whether there are any additional issues that CMS should consider to ensure effective and safe delivery of home infusion drugs