**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Part 414**

[CMS–1738–F, CMS–1687–F, and CMS–5531–F]

RINs 0938–AU17, 0938–AT21, and 0938–AU32

**Medicare Program; Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Policy Issues, and Level II of the Healthcare Common Procedure Coding System (HCPCS); DME Interim Pricing in the CARES Act; Durable Medical Equipment Fee Schedule Adjustments To Resume the Transitional 50/50 Blended Rates To Provide Relief in Rural Areas and Non-Contiguous Areas**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), Health and Human Services (HHS).

**ACTION:** Final rule.

**SUMMARY:** This final rule establishes methodologies for adjusting the Medicare durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) fee schedule amounts using information from the Medicare DMEPOS competitive bidding program (CBP) for items furnished on or after the effective date specified in the **DATES** section of this final rule, or the date immediately following the duration of the emergency period described in the Social Security Act (the Act), whichever is later. This final rule also establishes procedures for making benefit category and payment determinations for new items and services that are durable medical equipment (DME), prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations under Medicare Part B. In addition, this rule classifies continuous glucose monitors (CGMs) as DME under Medicare Part B. Lastly, this final rule finalizes certain DME fee schedule-related provisions that were included in two interim final rules with comment period (IFC) that CMS issued on May 11, 2018, and May 8, 2020.

**DATES:** These regulations are effective on February 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Alexander Ullman, 410–786–9671 or *DMEPOS@cms.hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

*A. Purpose*

This final rule makes changes related to: The Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) fee schedule amounts to ensure access to items and services in rural areas; procedures for making benefit category and payment determinations for new items and services that are DME, prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations to prevent delays in coverage of new items and services; and classification of CGMs under the Part B benefit for DME to establish the benefit category for these items. Finally, we are finalizing provisions included in two interim final rules with comment period (IFC) that CMS issued on May 11, 2018, and May 8, 2020.

1. Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Fee Schedule Adjustments

The purpose of this provision is to establish the methodologies for adjusting the fee schedule payment amounts for DMEPOS items and services furnished in non-competitive bidding areas (non-CBAs) on or after the effective date specified in the **DATES** section of this final rule, or the date immediately following the duration of the emergency period described in section 1135(g)(1)(B) of the Act (42 U.S.C. 1320b–5(g)(1)(B)), whichever is later. The emergency period we are referring to is the Public Health Emergency (PHE) for coronavirus disease 2019 (COVID–19). We refer readers to section III.A.6. of this rule for details regarding the DMEPOS fee schedule changes CMS has already made as a result of the PHE for COVID–19.

2. DMEPOS Fee Schedule Adjustments for Items and Services Furnished in Rural Areas From June 2018 Through December 2018 and Exclusion of Infusion Drugs From the DMEPOS CBP

The purpose of this section is to finalize and address comments received on the May 11, 2018 IFC (83 FR 21912) titled ''Medicare Program; Durable Medical Equipment Fee Schedule Adjustments to Resume the Transitional 50/50 Blended Rates to Provide Relief in Rural Areas and Non-Contiguous Areas'' (hereinafter referred to as the ''May 2018 IFC'').

3. Benefit Category and Payment Determinations for DME, Prosthetic Devices, Orthotics and Prosthetics, Therapeutic Shoes and Inserts, Surgical Dressings, or Splints, Casts, and Other Devices Used for Reductions of Fractures and Dislocations

The purpose of this section of the final rule is to establish procedures for making benefit category and payment determinations for new items and services that are DME, prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations that permit public consultation through public meetings. Section 531(b) of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA) (Pub. L. 106–554) requires the Secretary to establish procedures for coding and payment determinations for new DME under Part B of title XVIII of the Act that permit public consultation in a manner consistent with the procedures established for implementing coding modifications for ICD–9–CM (which has since been replaced with ICD–10–CM as of October 1, 2015). We decided to expand these procedures to address all new external HCPCS level II code requests in 2005. We are finalizing procedures for making benefit category determinations and payment determinations for new items and services that are DME, prosthetic devices, orthotics and prosthetics, therapeutic shoes and inserts, surgical dressings, or splints, casts, and other devices used for reductions of fractures and dislocations. Consistent with our current practices, the procedures will incorporate public consultation on these determinations.

The determination of whether or not an item or service falls under a Medicare benefit category, such as the Medicare Part B benefit category for DME, is a necessary step in determining whether an item may be covered under the Medicare program and, if applicable, what statutory and regulatory payment rules apply to the items and services. If the item is excluded from coverage by the Act or does not fall within the scope of a defined benefit category, the item cannot be covered under Medicare. On the other hand, if the item is not excluded from coverage by the Act and is found to fall within a benefit category, we need to determine what payment rules would apply to the item if other statutory criteria for coverage of the item are met, such as the reasonable and necessary criteria under section 1862(a)(1)(A) of the Act.

impede beneficiary access to these new, clinically proven technologies.

*Response:* We acknowledge BCDs reviews have been slowed down the past few years because this process was not formalized. We believe there is a benefit to finalizing these procedures and anticipate being able to make decisions more quickly and on a consistent timeframe outlined under the final regulation. However, we note that in situations where CMS has not established a BCD for an item or service, the BCD can be made by the MACs on a case-by-case basis as they adjudicate claims.

After consideration of the public comments we received and for the reasons we articulated, we are finalizing at §§ 414.114 and 414.240 the definitions related to and procedures for making BCDs and payment determinations for new items and services subject to the payment rules under subparts C or D of 42 CFR part 414 as proposed with a technical modification to remove a cross-reference to a HCPCS-related regulation we are not finalizing.

## VI. Classification and Payment for Continuous Glucose Monitors Under Medicare Part B

This section addresses classification and payment for CGMs under the Medicare Part B benefit for DME. We proposed to replace a CMS Ruling issued in January 12, 2017 titled Classification of Therapeutic Continuous Glucose Monitors as ''Durable Medical Equipment'' under Medicare Part B [Ruling] (CMS–1682–R) with this new rule.

### A. General Background

DME is a benefit category under Medicare Part B. Section 1861(n) of the Act defines ''durable medical equipment'' as including ''iron lungs, oxygen tents, hospital beds, and wheelchairs (which may include a power-operated vehicle that may be appropriately used as a wheelchair, but only where the use of such a vehicle is determined to be necessary on the basis of the individual's medical and physical condition and the vehicle meets such safety requirements as the Secretary may prescribe) used in the patient's home (including an institution used as his home other than an institution that meets the requirements of subsection (e)(1) of this section or section 1819(a)(1)) of the Act, whether furnished on a rental basis or purchased, and includes blood-testing strips and blood glucose monitors for individuals with diabetes without regard to whether the individual has Type I or Type II diabetes or to the individual's use of insulin (as determined under standards established by the Secretary in consultation with the appropriate organizations) and eye tracking and gaze interaction accessories for speech generating devices furnished to individuals with a demonstrated medical need for such accessories; except that such term does not include such equipment furnished by a supplier who has used, for the demonstration and use of specific equipment, an individual who has not met such minimum training standards as the Secretary may establish with respect to the demonstration and use of such specific equipment. With respect to a seat-lift chair, such term includes only the seat-lift mechanism and does not include the chair.''

In addition to this provision, in most cases, an item must also meet the requirements of section 1862(a)(1)(A) of the Act, which precludes payment for an item or service that is not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and section 1862(a)(6) of the Act, which precludes payment for personal comfort items.

The Medicare program was created as part of the Social Security Amendments of 1965 (Pub. L. 89–97), and the Part B benefit payments for DME were initially limited to ''rental of durable medical equipment, including iron lungs, oxygen tents, hospital beds, and wheelchairs used in the patient's home (including an institution used as his home)'' in accordance with the definition of DME at section 1861(s)(6) of the Act. The Social Security Amendments of 1967 (Pub. L. 90–248) amended the statute to allow for payment on a purchase basis for DME in lieu of rental for items furnished on or after January 1, 1968. Section 144(d) of the Social Security Amendments of 1967 changed the language under section 1861(s) of the Act to ''durable medical equipment, including iron lungs, oxygen tents, hospital beds, and wheelchairs used in the patient's home (including an institution used as his home), whether furnished on a rental basis or purchased.'' Payments for purchase of expensive items of DME were limited to monthly installments equivalent to what would have otherwise been made on a rental basis, limited to the period of medical need and not to exceed the purchase price of the equipment.

In 1975, Medicare program instructions in section 2100 of chapter 2 of part 3 of the Medicare Carrier's Manual (HCFA Pub. 14–3) indicated that expenses incurred by a beneficiary for the rental or purchase of DME are reimbursable if the following three requirements are met: The equipment meets the definition of DME in this section; and the equipment is necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of his malformed body member; and the equipment is used in the patient's home. The instructions also indicated that payment may also be made under the DME benefit category for repairs and maintenance of equipment owned by the beneficiary as well as expendable and non-reusable supplies and accessories essential to the effective use of the equipment. DME was defined under these program instructions from 1975 as equipment meeting four requirements (quoted later in the section verbatim and with text underscored as in the original instructions):

Durable medical equipment is equipment which (a) can withstand repeated use, *and* (b) is primarily and customarily used to serve a medical purpose, *and* (c) generally is not useful to a person in the absence of an illness or injury; and (d) is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be durable medical equipment.

Additional detailed instructions were provided in 1975 describing the underlying policies for determining whether an item meets the definition of DME and specifically addressed what the terms ''durable'' and ''medical equipment'' mean. The instructions indicated that an item is considered durable if it can withstand repeated use, that is, it is the type of item that could normally be rented, and that medical supplies of an expendable nature are not considered ''durable'' within the meaning of the definition. To be considered DME, the item must be able to be rented out to multiple patients and thus withstand repeated use. The instructions indicated that medical equipment is equipment primarily and customarily used for medical purposes and is not generally useful in the absence of illness or injury. The instructions indicated that in some cases information from medical specialists and the manufacturer or supplier of products new to the market may be necessary to determine whether equipment is medical in nature. Additional instructions provide examples of equipment which presumptively constitutes medical equipment, such as canes, crutches, and walkers, and equipment that is

primarily and customarily used for a nonmedical purpose and cannot be considered DME even when the item has some remote medically related use, such as air conditioners. Equipment that basically serves comfort or convenience functions or is primarily for the convenience of a person caring for the patient, such as elevators, and posture chairs, do not constitute medical equipment. Similarly, physical fitness equipment, first-aid or precautionary-type equipment, self-help equipment, and training equipment are considered nonmedical in nature. These program instructions from 1975 are still in effect and are now located in section 110 of chapter 15 of the Medicare Benefits Policy Manual (CMS Pub. 100–02).

The Social Security Amendments of 1977 (Pub. L. 95–142) amended the statute to mandate a ''rent/purchase'' program or payment methodology for DME; CMS would pay for each item furnished to each beneficiary on either a rental or purchase basis depending on which method was considered more economical. The decision regarding whether payment for DME was made on a rental or purchase basis was made by the Medicare Part B carrier (Medicare contractor) processing the claim. The rent/purchase program was implemented from February 1985 through December 1988.

Section 2321 of the Deficit Reduction Act of 1984 (Pub. L. 98–369) moved the definition of DME from section 1861(s)(6) of the Act to section 1861(n) of the Act and included a more detailed definition of DME.

Section 4062(b) of the Omnibus Budget Reconciliation Act (OBRA) of 1987 (Pub. L. 100–203) amended the statute to terminate the rent/purchase program and add section 1834(a) to the Act with special payment rules for DME furnished on or after January 1, 1989. DME items were to be classified into different classes under paragraphs (2) through (7) of section 1834(a) of the Act, with specific payment rules for each class of DME. Section 1834(a) of the Act still governs payment for items and services furnished in areas that are not included in the competitive bidding program mandated by section 1847(a) of the Act. Section 1834(a)(2) of Act indicates that payment is made on a rental basis or in a lump sum amount for the purchase of an item the purchase price of which does not exceed $150 (inexpensive equipment) or which the Secretary determines is acquired at least 75 percent of the time by purchase (routinely purchased equipment) or which is an item specified under sections 1834(a)(2)(A)(iii) and (iv) of the Act. The term ''routinely purchased equipment'' is defined in regulations at 42 CFR 414.220(a)(2) as equipment that was acquired by purchase on a national basis at least 75 percent of the time during the period July 1986 through June 1987.

Medicare began covering blood glucose monitors under the DME benefit in the early 1980s and the test strips and other supplies essential for the effective use of the glucose monitor were also covered. Blood glucose monitors were expensive equipment within the meaning of section 1834(a)(2) of the Act but were routinely purchased (more than 75 percent of the time on a national basis) during the period July 1986 through June 1987. Therefore, payment was made on a fee schedule basis for blood glucose monitors based on the lower of the supplier's actual charge for the item or a statewide fee schedule amount calculated for the item based on the average rental or purchase payment for the item in the State for the 12-month period ending on June 30, 1987. The rental and purchase fee schedule amounts are increased on an annual basis based on the provisions set forth in section 1834(a)(14) of the Act.

The special payment rules for DME mandated by section 1834(a) of the Act were implemented via program instructions for all DME items other than oxygen and oxygen equipment on January 1, 1989. CMS established and implemented fee schedule amounts for inexpensive or routinely purchased items, for payment on a rental basis, payment on a lump sum purchase basis when the item is new, and payment on a lump sum purchase basis when the item is used. We also promulgated rules implementing the special payment rules for DME mandated by section 1834(a) of the Act. For more information, see the October 9, 1991 and December 7, 1992 **Federal Registers** (56 FR 50821 and 57 FR 57675, respectively), and a July 10, 1995, final rule (60 FR 35492).

We established a definition for DME items and services during this time at 42 CFR 414.202, which simply mirrored the general definition of DME established in 1975 via program instructions.

Section 1861(n) of the Act was revised by section 4105(b)(1) of the Balanced Budget Act of 1997 (Pub. L. 105–33) to expand coverage of blood glucose monitors and test strips to patients with type II diabetes. As noted, these items had already been covered as DME (glucose monitoring equipment) and disposable supplies (test strips) since the early 1980s, but coverage was limited to patients with type I diabetes.

We added to the definition of DME at 42 CFR 414.202 effective for items furnished after January 1, 2012, to require that the item have a minimum lifetime of 3 years to be considered DME. This 3-year minimum lifetime requirement was established in a final rule published in the November 10, 2011 **Federal Register** titled ''Medicare Program; End-Stage Renal Disease Prospective Payment System and Quality Incentive Program; Ambulance Fee Schedule; Durable Medical Equipment; and Competitive Acquisition of Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies'' (76 FR 70228 and 70314). This final rule included a discussion of how the 3-year minimum lifetime requirement (MLR) is applied to multicomponent devices or systems consisting of durable and nondurable components (76 FR 70291). In this rule, we noted that a device may be a system consisting of durable and nondurable components that together serve a medical purpose, and that we consider a multicomponent device consisting of durable and nondurable components nondurable if the component that performs the medically necessary function of the device is nondurable, even if other components of the device are durable. In regards to the 3-year MLR, the component(s) of a multicomponent device that performs the medically necessary function of the device must meet the 3-year MLR (76 FR 70291).

In summary, DME is covered under Medicare Part B. DME is defined under section 1861(n) of the Act and Medicare claims for DME are paid in accordance with the special payment rules under section 1834(a) of the Act or under the competitive bidding program mandated by sections 1847(a) and (b) of the Act. Rules related to the scope and conditions of the benefit are addressed at 42 CFR 410.38. Under § 414.202, durable medical equipment means equipment which—

• Can withstand repeated use;
• Effective with respect to items classified as DME after January 1, 2012, has an expected life of at least 3 years;
• Is primarily and customarily used to serve a medical purpose;
• Generally is not useful to a person in the absence of an illness or injury; and
• Is appropriate for use in the home.

All requirements of the definition must be met before an item can be considered to be DME.

*B. Continuous Glucose Monitors*

On January 12, 2017, we issued a CMS Ruling (CMS–1682–R) articulating the CMS policy concerning the classification of therapeutic continuous

glucose monitoring systems as DME under Part B of the Medicare program. CMS–1682–R is available on the *CMS.gov* website at: *https://www.cms.gov/Regulations-and-Guidance/Guidance/Rulings/CMS-Rulings.*

CMS–1682–R classified continuous glucose monitoring systems as "therapeutic continuous glucose monitors (CGMs)" that meet the definition of DME if the equipment—

• Is approved [or cleared] by the FDA for use in place of a blood glucose monitor for making diabetes treatment decisions (for example, changes in diet and insulin dosage);

• Generally is not useful to the individual in the absence of an illness or injury;

• Is appropriate for use in the home; and

• Includes a durable component (a component that CMS determines can withstand repeated use and has an expected lifetime of at least 3 years) that is capable of displaying the trending of the continuous glucose measurements.

Under CMS–1682–R, in all other cases in which a CGM does not replace a blood glucose monitor for making diabetes treatment decisions, a CGM is not considered DME. We reasoned that enabling a beneficiary to make diabetes treatment decisions was the medical purpose of a glucose monitor, that non-therapeutic CGMs did not serve that medical purpose, and that non-therapeutic CGMs therefore were not DME. CMS–1682–R also addressed the calculation of the fee schedule amounts for therapeutic CGMs in accordance with the rules at section 1834(a) of the Act and under regulations at 42 CFR part 414, subpart D.

CGMs are systems that use disposable glucose sensors attached to the patient to monitor a patient's interstitial fluid glucose level on a continuous basis by either automatically transmitting the glucose readings from the sensor via a transmitter to a device that displays the readings ("automatic" CGMs), or by displaying the glucose readings from the sensor on a device that the patient manually holds over the sensor ("manual" CGMs). Some CGMs are class III devices and require premarket approval by the FDA, while some newer CGM models are class II devices that do not require premarket approval and may go through FDA's 510(k) premarket process, whereby devices can obtain clearance by demonstrating substantial equivalence to a predicate device. The glucose sensor continuously measures glucose values in the interstitial fluid, the fluid around the cells (in contrast to blood glucose monitors which measure glucose values using fingertip blood samples). The sensor is a small flexible metal probe or wire that is inserted under the skin and has a coating that prevents the body's immune system from detecting and attacking the foreign probe. Once the coating wears off, which in current models takes place in 7 to 14 days, the sensor must be replaced for safety reasons. The glucose sensor generates small electrical signal in response to the amount of sugar that is present (interstitial glucose). This electrical signal is converted into a glucose reading that is received/displayed on a dedicated continuous glucose monitor (the CGM). Insulin pumps covered as DME or a compatible mobile device (smart phone, smart watch, tablet, etc.) and app that are not covered as DME may also perform the function of a CGM, which receives and displays the glucose measurements in the form of a graph so that the patient can visualize how their glucose measurements are trending. CMS–1682–R only addressed whether CGMs meet the Medicare definition of DME and did not address whether insulin pumps that can also perform the function of a CGM are DME since insulin pumps are already classified as DME under an NCD (section 280.14 of Chapter 1, Part 4 of the Medicare National Coverage Determinations Manual, Pub. 100–03).

CMS–1682–R classifies CGM display devices as DME if they have been approved [or cleared] by the FDA for use in making diabetes treatment decisions, such as changing one's diet or insulin dosage based solely on the readings of the CGM, that is, without verifying the CGM readings with readings from a blood glucose monitor. These CGMs are referred to as "non-adjunctive" or "therapeutic" CGMs in CMS–1682–R. In contrast, CGMs that patients use to check their glucose levels and trends that must be verified by use of a blood glucose monitor to make diabetes treatment decisions are not currently classified as DME. These CGMs are referred to as "adjunctive" or "non-therapeutic" CGMs in CMS–1682–R. It is important to note that there were no "adjunctive" or "non-therapeutic" CGM receivers being manufactured and sold on the market as of the time this rule was drafted. This fact was brought to light by comments submitted on the proposed rule and discussed in more detail later in this final rule.

*C. Current Issues*

As indicated previously, there are currently no adjunctive CGM receivers being manufactured and sold on the market. However, beneficiaries are currently using disposable continuous glucose sensors and transmitters that have not been approved or cleared by the FDA to replace a blood glucose monitor for use in making diabetes treatment decisions with insulin infusion pumps that also function as "adjunctive" or "non-therapeutic" CGM receivers. Beneficiaries are using the readings from these disposable sensors that are received and displayed by the insulin pump to help manage their diabetes. Claims submitted for CGM sensors and transmitters used with insulin pumps are being denied inappropriately based on CMS–1682–R even though this Ruling only addressed the classification of CGM receivers as DME and did not address coverage of CGM sensors and transmitters used with insulin pumps. This final rule addresses whether adjunctive or "non-therapeutic" CGMs meet the five requirements or prongs of the definition of DME at 42 CFR 414.202 and how the fee schedule amounts should be calculated for CGM supplies and accessories.

1. Requirements of DME Definition

(a) Ability To Withstand Repeated Use

This criterion under 42 CFR 414.202 addresses the issue of whether an item of medical equipment can withstand repeated use, which means it is an item that can be rented and used by successive patients. Equipment must be able to withstand repeated use to fall within the scope of the Medicare Part B benefit for DME. The continuous glucose monitor's receiver component is durable equipment that can be rented and used by successive patients to monitor the trending of glucose levels that are either transmitted to the device using disposable sensors or are read or received by the device when the patient holds the device near the sensor. Therefore, we believe this equipment meets the requirement to withstand repeated use; that is, equipment that could normally be rented and used by successive patients.

(b) Expected Life of at Least 3 Years

This criterion under 42 CFR 414.202 further addresses the issue of "durability" and provides a clear minimum timeframe for how long an item must last to meet the definition of DME. We believe the continuous glucose monitor or receiver meets the 3-year minimum lifetime requirement. In the case of one manufacturer, reliability analysis data from an engineering firm that evaluated their CGM product predicted a lifetime of greater than 3 years for the receiver. Because the CGM sensors and transmitters only have a

predicted life of days (for the sensors) or several months (for the transmitters), the receiver is the only durable component of a CGM system.

(c) Primarily and Customarily Used To Serve a Medical Purpose

We proposed that CGMs that have not been approved or cleared by the FDA for use in making diabetes treatment decisions without the use of a blood glucose monitor but can be used to alert the patient about potentially dangerous glucose levels while they sleep, are primarily and customarily used to serve a medical purpose. Likewise, we believe that disposable continuous glucose sensors and transmitters that work in conjunction with an insulin pump that also operates as a continuous glucose monitor's receiver component to alert the patient about potentially dangerous glucose levels while they sleep are primarily and customarily used to serve a medical purpose. We now believe that because adjunctive CGMs or adjunctive continuous glucose sensors and transmitters used with insulin pumps can provide information about potential changes in glucose levels while a beneficiary is sleeping and is not using a blood glucose monitor, these CGMs or CGM functions on insulin pumps are primarily and customarily used to serve a medical purpose.

(d) Generally Not Useful to a Person in the Absence of an Illness or Injury

CMS has determined that both adjunctive and non-adjunctive/therapeutic CGM systems are generally not useful to a person in the absence of an illness or injury because people who do not have diabetes generally would not find a monitor that tracks their glucose levels to be useful. Thus far, Medicare's coverage policy for CGMs has supported the use of therapeutic CGMs in conjunction with a smartphone (with the durable receiver as backup), including the important data sharing function they provide for patients and their families.[26] CMS previously concluded that therapeutic CGMs, when used in conjunction with a smartphone, still satisfied the definition of DME because the durable receiver, used as a backup, was generally not useful to a person in the absence of an illness or injury, even if the smartphone might be. We are not changing this policy. We proposed that both therapeutic and non-therapeutic CGMs, when used in conjunction with a smartphone, satisfy the definition of DME because the durable receiver, used as a backup, is not generally useful to a person in the absence of an illness or injury. Medicare does not cover or provide payment for smartphones under the DME benefit. In order for Medicare to cover disposable glucose sensors, transmitters and other non-durable components of a CGM system, these disposable items must be used with durable CGM equipment that meets the Medicare definition of DME, which smartphones do not. If a Medicare beneficiary is using durable CGM equipment or an insulin pump with a CGM feature that meets the Medicare definition of DME as a backup, but primarily uses a smartphone or other non-DME device to display their glucose readings in conjunction with the covered DME item as described previously, Medicare will cover the disposable items since the beneficiary is using their covered DME item as a backup to display their glucose readings. However, if the beneficiary is exclusively using a non-DME item like a smartphone to display glucose readings from disposable sensors, transmitters or other disposable CGM supplies, these disposable supplies cannot be covered since there is no covered item of DME in this scenario, even as a backup.

(e) Appropriate for Use in the Home

The FDA has cleared or approved CGM systems as safe and effective for use by the patient in their homes similar to how blood glucose monitoring systems have been used in the home for many years. Both adjunctive and non-adjunctive CGMs are appropriate for use in the home for the same purpose that a blood glucose monitor is used in the home.

*Comment:* With regard to the proposal to expand classification of durable medical equipment (DME) to all types of CGMs ("adjunctive" as well as "non-adjunctive"), most commenters agreed with the proposal but multiple commenters pointed out that the only adjunctive CGM system on the market today does not include a dedicated durable CGM receiver. Some commenters recommended classifying the software application (App) that allows smart phones to function as CGM receivers as DME.

*Response:* We have confirmed with the FDA that the one adjunctive CGM product on the market today, the Guardian™ Connect System, consists of disposable glucose sensors and transmitters that work in conjunction with the patient's smart phone and App or with certain MiniMed insulin infusion pumps instead of a dedicated durable receiver. Software applications do not meet the definition of DME, nor do phones or computers. To cover the software application under the Medicare Part B benefit for DME, the equipment that the software is added to, or some part of the CGM system used with the software, must meet the Medicare definition of DME at 42 CFR 414.202, including the requirement that the equipment or system component not be useful in the absence of illness or injury. Smart phones are useful in the absence of illness or injury and therefore do not meet the definition of DME. Therefore, a CGM system that consists of a software application added to a smart phone and disposable supplies is not covered under the Medicare Part B benefit for DME. However, smart devices (watch, smartphone, tablet, laptop computer, etc.) can be used in conjunction with a continuous glucose monitor.

In contrast, durable insulin infusion pumps have been classified and covered as DME since the mid-1990s. Therefore, in accordance with this final rule, an insulin pump that also performs the functions of an adjunctive CGM would also be classified and covered as DME.

After consideration of the public comments we received, we are finalizing the proposed rule to expand classification of DME to both adjunctive and non-adjunctive CGMs as long as all requirements of the definition of DME at 42 CFR 414.202 are met. There are adjunctive continuous glucose monitoring sensors and transmitters that do not meet the durability requirement and are used exclusively in conjunction with devices such as smart phones, which are not DME for the previously stated reasons; neither the sensors and transmitters nor the smart phones meet the Medicare definition of DME. In situations where these adjunctive continuous glucose monitoring sensors and transmitters are used in conjunction with an insulin infusion pump that also functions as a CGM receiver, the sensors and transmitters can be covered under the DME benefit, subject to other requirements and criteria. We note that if the beneficiary does not meet the medical necessity criteria for an insulin pump, then the insulin pump would not be covered and therefore any supplies used with the insulin pump would also not be covered.

2. Fee Schedule Amounts for CGM Receivers/Monitors and Related Accessories

Medicare payment for DME was made on a reasonable charge basis prior to 1989. The regulations related to implementation of the reasonable charge payment methodology are found at 42 CFR part 405, subpart E. The current Medicare payment rules for glucose

---

[26] https://www.cms.gov/Center/Provider-Type/Durable-Medical-Equipment-DME-Center.

monitors and other DME are located at section 1834(a) of the Act and mandate payment on the basis of fee schedule amounts beginning in 1989. Blood glucose monitors are classified as routinely purchased items subject to the payment rules for inexpensive and routinely purchased DME at section 1834(a)(2) of the Act, which mandate payment for routinely purchased items on a purchase or rental basis using fee schedule amounts based on average reasonable charges for the purchase or rental of the item for the 12-month period ending on June 30, 1987, increased by the percentage increase in the consumer price index for all urban consumers (U.S. city average) for the 6-month period ending with December 1987. These base fee schedule amounts are increased on an annual basis based on the update factors located in section 1834(a)(14) of the Act, which includes specific update factors for 2004 through 2008 for class III devices described in section 513(a)(1)(C) of the Federal Food, Drug, and Cosmetic Act. Routinely purchased equipment is defined in the regulations at 42 CFR 414.220(a)(2) as equipment that was acquired by purchase on a national basis at least 75 percent of the time during the period July 1986 through June 1987. Section 1834(a)(1)(C) of the Act states that subject to subparagraph (F)(ii), this subsection must constitute the exclusive provision of this title [Title XVIII of the Act] for payment for covered items under this part [Medicare Part B] or under Part A to a home health agency. The fee schedule amounts for blood glucose monitors were revised in 1995 using special payment limits established in accordance with the ''inherent reasonableness'' authority at section 1842(s)(8) of the Act. The final notice (BPD–778–FN) establishing special payment limits for blood glucose monitors was published in the January 17, 1995 **Federal Register** (60 FR 3405), with the payment limits updated on an annual basis using the DME fee schedule update factors in section 1834(a)(14) of the Act.

Because certain CGMs have been approved or cleared by the FDA to replace blood glucose monitors for use in making diabetes treatment decisions, we believe that CGMs represent a newer technology version of glucose monitors paid for by Medicare in 1986 and 1987. In addition, the CGM systems function similar to the blood glucose monitors in using disposable supplies or accessories, such as test strips or sensors, to measure glucose levels in a patient's body, either from the patient's blood or interstitial fluid, and using durable equipment to convert these glucose measurements in a way that they can be displayed on a screen on the equipment. Therefore, we believe that the CGM receivers/monitors must be classified as routinely purchased DME since they are a technological refinement of glucose monitors routinely purchased from July 1986 through June 1987. The alternative would be to classify CGM receivers/monitors as other items of DME under section 1834(a)(7) of the Act and pay for the equipment on a capped rental basis. We also believe the average reasonable charge data for blood glucose monitors from 1986 and 1987 can be used to establish the fee schedule amounts for CGM receivers/monitors in accordance with our regulations 42 CFR 414.238(b) since CGM receivers/monitors are comparable to blood glucose monitors.

We do not believe that the special payment limits established in 1995 for blood glucose monitors must apply to CGM receivers/monitors because these special payment limits were based on specific pricing information on the cost of blood glucose monitors. We therefore proposed to continue using the fee schedule amounts established in CMS–1682–R based on the updated 1986/87 average reasonable charges for blood glucose monitors as the fee schedule amounts for CGM receivers/monitors. As noted, section 1834(a)(14) of the Act provides different annual update factors for class III DME versus other DME items and so the fee schedule amounts for class III CGM receivers are slightly higher (from $231.77 to $272.63 in 2020) than the fee schedule amounts for class II CGM receivers (from $208.76 to $245.59 in 2020).

With regard to the fee schedule amounts for supplies and accessories for CGMs, we proposed to separate payment for CGM supplies and accessories into three separate categories of supplies and accessories with different fee schedule amounts for each category. The current 2020 monthly fee schedule amounts of $222.77 and $259.20 for supplies and accessories for CGM systems apply to all types of class II or class III therapeutic CGMs, respectively, but were established based on supplier price lists for only one type of CGM system approved by FDA for use in making diabetes treatment decisions without the need to use a blood glucose monitor to verify the results (non-adjunctive CGMs). The supplier prices used to establish these fee schedule amounts were for non-adjunctive CGM systems that use a combination of sensors and transmitters to automatically send glucose measurements to the CGM receiver without manual intervention by the patient. We refer to this type of CGM system as a non-adjunctive system, or a system that both replaces a blood glucose monitor for use in making diabetes treatment decisions, and can alert the patient about dangerous glucose levels while they sleep based on the automatic transmission of the glucose readings to the receiver on a 24-hour basis. The fee schedule amounts of $222.77 and $259.20 for supplies and accessories for class II and class III CGMs, respectively, increased by the fee schedule update factor for 2021, would continue to apply to the supplies and accessories for automatic, non-adjunctive CGMs effective the effective date specified in the **DATES** section of this final rule.

If a beneficiary uses disposable ''adjunctive'' or ''non-therapeutic'' continuous glucose sensors and transmitters with an insulin infusion pump, the beneficiary and Medicare program would still incur expenses associated with use of blood glucose monitors and supplies. To avoid a situation where the beneficiary and program would pay twice for glucose monitoring supplies needed to accurately assess glucose levels, we proposed to establish the fee schedule amounts for supplies and accessories for adjunctive CGMs based on supplier prices for the sensors and transmitters minus the fee schedule amounts for the average quantity and types of blood glucose monitoring supplies used by insulin-treated beneficiaries who would be more likely to qualify for coverage of a CGM system based on a need to more closely monitor changes in their glucose levels. The adjunctive CGM system is not replacing the function of the blood glucose monitor and related supplies and therefore only provides an adjunctive or added benefit of alerting the beneficiary when their glucose levels might be dangerously high or low. Since the adjunctive CGM system cannot function alone as a glucose monitor for use in making diabetes treatment decisions, we proposed to reduce the payment for the adjunctive CGM system by the amount that is paid separately for the blood glucose monitor and supplies that are needed in addition to the adjunctive CGM system and are not needed in addition to the non-adjunctive CGM systems. Currently, Medicare is allowing coverage and payment for 135 test strips and lancets per month for insulin-treated beneficiaries using blood glucose monitors. Using the 2020 mail order fee schedule amounts for 50 test strips, divided by 50 and multiplied by 135,

plus the 2020 mail order fee schedule amounts for 100 lancets, divided by 100 and multiplied by 135, plus the 2020 mail order fee schedule amounts for a monthly supply of batteries, calibration solution, and lancet device, plus the 2020 fee schedule amount for the blood glucose monitor divided by 60 months (5-year lifetime) results in a 2020 monthly allowance of $34.35, which reflects what Medicare currently pays per month for an insulin-treated diabetic beneficiary. Based on supplier invoices and other prices, a 2020 monthly price for supplies and accessories used with class II or class III adjunctive CGMs would be calculated to be $209.97 and $233.12 respectively. Subtracting the monthly cost of the blood glucose monitor and supplies of $34.35 from the monthly cost of the supplies and accessories for class II adjunctive CGMs results in a net price of $175.62 ($209.97 − $34.35 = $175.62) for the monthly supplies and accessories used with a class II adjunctive CGM after backing out the cost of the separately paid blood glucose supplies. Subtracting the monthly cost of the blood glucose monitor and supplies of $34.35 from the monthly cost of the supplies and accessories for class III adjunctive CGMs results in a net price of $198.77 ($233.12 − $34.35 = $198.77) for the monthly supplies and accessories used with a class III adjunctive CGM after backing out the cost of the separately paid blood glucose supplies. Thus, we proposed 2020 fee schedule amounts of $175.62 and $198.77 (to be increased by the 2021 fee schedule update factor yet to be determined) for use in paying claims in 2021 for the monthly supplies and accessories for use with class II and class III adjunctive CGMs respectively. Reducing the payment amount for supplies and accessories used with adjunctive CGMs by the average monthly payment for the blood glucose monitor and supplies that Medicare and the beneficiary will still have to pay for avoids a situation where the beneficiary and the program pay twice for glucose testing supplies and equipment.

Finally, a third type of CGM system currently on the market is non-adjunctive but does not automatically transmit glucose readings to the CGM receiver and therefore does not alert the patient about dangerous glucose levels while they sleep. We refer to this as a manual, non-adjunctive CGM system. We proposed to establish 2020 fee schedule amounts of $46.86 (for class II devices) and $52.01 (for class III devices) for the monthly supplies and accessories for this third category, which only uses disposable batteries and sensors, based on supplier prices for the supplies and accessories for this category of CGMs.

*Comment:* Many commenters did not agree with the proposal to establish separate codes and pricing for supplies for three types of CGM systems on the market today. They strongly believe that linking coding and payment to the specific types of CGMs on the market today was not wise given the rapid pace in changes in technology for CGMs and diabetic equipment in general. Many commenters specifically objected to establishing separate codes and fee schedule amounts for automatic versus manual non-adjunctive CGMs. They recommended that the continuity of pricing regulations should be observed and that the initial prices established based on automatic non-adjunctive CGMs alone should apply to manual non-adjunctive CGMs as well. The manufacturer of the manual non-adjunctive CGM pointed out that their new product line for CGMs offers continuous data transmission from sensor to receiver, enabling customizable, real-time alarms and alerts that can automatically alert users when their glucose is high or low, including while they sleep, without any patient intervention. Therefore, it appears that the manual non-adjunctive CGM systems and classification are already becoming obsolete.

*Response:* We agree with the commenters that glucose monitoring technology is changing rapidly, and the Medicare fee schedule amounts for this equipment should not be limited solely to the technology that is currently on the market. We believe that the existing fee schedule amounts for non-adjunctive CGMs and supplies and accessories necessary for the effective use of non-adjunctive CGMs should continue to be used in paying claims for these items. However, the utility offered by adjunctive CGMs is not the same as the utility offered by non-adjunctive CGMs and so we do not believe that the existing fee schedule amounts established for the non-adjunctive CGMs and supplies and accessories necessary for the effective use of non-adjunctive CGMs should be used in paying claims for adjunctive CGMs and supplies and accessories necessary for the effective use of adjunctive CGMs, which clearly are different types of CGMs because they cannot be used in place of a blood glucose monitor. As explained further later in this section, we believe that separate fee schedule amounts are needed for adjunctive CGMs and supplies and related accessories versus non-adjunctive CGMs and related supplies and accessories.

*Comment:* Many commenters stated that more details were needed on how the proposed fee schedule amounts were established for the separate codes for supplies used with the three types of CGM systems on the market today.

*Response:* We are not finalizing the proposed fee schedule amounts for the monthly supplies and accessories associated with three different types of CGMs. Although we will continue using existing fee schedule amounts established for non-adjunctive CGMs, these are not fee schedule amounts for adjunctive CGMs and therefore do not apply to adjunctive CGMs.

*Comment:* Many commenters believe the proposed fee schedule amounts for supplies for CGMs were not sufficient to cover the cost of these items. A commenter stated that the proposed fee schedule amounts are below internet retail prices while other commenters simply stated that the proposed fee schedule amounts are below the cost of the products.

*Response:* The fee schedule amounts for supplies necessary for the effective use of CGMs is required to be established in accordance with the rules of the statute at section 1834(a) of the Act. In establishing Medicare fee schedule amounts for DME items, section 1834(a) of the Act requires that CMS base payment amounts on average reasonable charges in 1986 and 1987.

After consideration of the public comments we received, we are not finalizing the proposed fee schedule amounts for supplies and accessories used in conjunction with three types of CGMs. We believe the technology associated with the manual, non-adjunctive category is already becoming obsolete as more CGM products that automatically transmit sensor readings to the receiver and provide night time alarms come on the market. As the commenters pointed out, the technology is evolving quickly and establishing categories based on the different variations of CGMs on the market at any one time does not seem prudent or necessary. However, we do note that there is a substantial difference in the utility and capabilities of adjunctive CGMs versus non-adjunctive CGMs in that while both are able to alert the patient about dangerous or potentially dangerous glucose levels while they sleep, the non-adjunctive CGMs are also able to replace the use of a blood glucose monitor for accurate glucose measuring/testing purposes, while the adjunctive CGMs are not.

A blood glucose monitor and related supplies are necessary for patients using

adjunctive CGMs for accurate glucose measuring/testing purposes, while patients using a non-adjunctive CGM do not also need a blood glucose monitor. Existing fee schedule amounts for therapeutic or non-adjunctive CGMs and related supplies and accessories were specifically established for those types of CGMs and do not apply to adjunctive CGMs and related supplies and accessories. Therefore, fee schedule amounts for adjunctive CGMs and related supplies and accessories will be established in accordance with existing regulations for gap-filling under 42 CFR 414.238(b).

Summary of final provisions:

• We are finalizing our proposal to expand the classification of DME to a larger swath of CGMs, regardless of whether they are non-adjunctive (can alert patients when glucose levels are approaching dangerous levels, including while they sleep and also replace blood glucose monitors) or adjunctive (can alert patients when glucose levels are approaching dangerous levels, including while they sleep but do not replace blood glucose monitors), as long as such CGMs satisfy the regulatory definition of DME. For example, to be classified under the Medicare Part B benefit for DME, a potential CGM would need to have a durable component performing the medically necessary function of the device that can withstand repeated use for at least 3 years, and is not useful in the absence of illness or injury, in accordance with 42 CFR 414.202.

• We are not finalizing the proposed fee schedule amounts for CGMs and related supplies and accessories.

• Therefore, the fee schedule amounts for adjunctive CGM and related supplies and accessories will be established in accordance with existing regulations for gap-filling under 42 CFR 414.238(b).

## VII. DME Interim Pricing in the CARES Act

In this final rule, we are finalizing the DME provisions of an IFC (May 2020 COVID–19 IFC) which made conforming changes to the DME payment regulations to reflect the CARES Act. The CARES Act (Pub. L. 116–136) was enacted on March 27, 2020. Section 3712 of the CARES Act specifies the payment rates for certain DME and enteral nutrients, supplies, and equipment furnished in non-CBAs through the duration of the emergency period described in section 1135(g)(1)(B) of the Act. Section 3712(a) of the CARES Act continues our policy of paying the 50/50 blended rates for items furnished in rural and non-contiguous non-CBAs through December 31, 2020, or through the duration of the emergency period, if longer. Section 3712(b) of the CARES Act increased the payment rates for DME and enteral nutrients, supplies, and equipment furnished in areas other than rural and non-contiguous non-CBAs through the duration of the emergency period. Beginning March 6, 2020, the payment rates for DME and enteral nutrients, supplies, and equipment furnished in these areas are based on 75 percent of the adjusted fee schedule amount and 25 percent of the historic, unadjusted fee schedule amount, which results in higher payment rates as compared to the full fee schedule adjustments that were previously required under § 414.210(g)(9)(iv). We made changes to the regulation text at § 414.210(g)(9), consistent with section 3712 of the CARES Act, in an IFC that we published in the May 8, 2020 **Federal Register** titled ''Medicare and Medicaid Programs; Additional Policy and Regulatory Revisions in Response to the COVID–19 Public Health Emergency.''

We received six timely pieces of correspondence in response to the May 2020 COVID–19 IFC provision titled ''DME Interim Pricing in the CARES Act''.

*Comment:* Many of the commenters appreciated that CMS modified the regulations consistent with section 3712 of the CARES Act.

*Response:* We thank the commenters for their support.

*Comment:* Many of the commenters cited reasons why the increased payments rates for DME are needed during the PHE. A commenter stated that ensuring access to personal protective equipment (PPE) and other DME for beneficiaries is essential to preventing the spread of COVID–19. Another commenter stated that this provision is in the overall interest to everyone—suppliers, health care professionals and beneficiaries—as suppliers will be able to maintain their inventory and be paid for items when there may be lags in care and beneficiaries may not be able to meet required visits due to the current PHE. Another commenter stated that there have been broad-based increases in the acquisition costs of certain home medical equipment (for example, ventilators, oxygen concentrators) as well as an increase in various overhead expenses (for example, requisite personal protective equipment and a more labor-intensive delivery/instruction methodology). The commenter stated that this has created financial hardships for many suppliers servicing the PHE patients.

*Response:* We believe that section 3712 of the CARES Act addresses these concerns about the need for payment increases during the PHE.

*Comment:* A commenter suggested that the adjustment for the 75/25 blend in the non-rural and contiguous non-CBAs should be maintained—at a minimum—to the end of 2020. The commenter also stated that if Round 2021 of the CBP is delayed, then the 75/25 blended rates should be extended from 2020 and subsequent years and maintained until the program is implemented. The commenter also stated that if Round 2021 is delayed, the 75/25 blended rates should be extended to all non-rural providers, including the former CBAs, until the next CBP can be implemented. The commenter then stated that if there is a delay in Round 2021, the 50/50 blended rates for rural areas should be extended until the next Round of the CBP is implemented.

*Response:* This provision implements section 3712 of the CARES Act. Section 3712(a) of the CARES Act continues our policy of paying the 50/50 blended rates for items furnished in rural and non-contiguous non-CBAs through December 31, 2020, or through the duration of the emergency period, if longer. Section 3712(b) of the CARES Act increased the payment rates for DME and enteral nutrients, supplies, and equipment furnished in areas other than rural and non-contiguous non-CBAs through the duration of the emergency period. As such, and because the PHE has continued into 2021, the 50/50 blended rates in rural and non-contiguous non-CBAs and the 75/25 blended rates in the non-rural contiguous non-CBAs have remained in effect. This provision does not address fee schedule adjustments after the PHE. We proposed a fee schedule adjustment rule for after the PHE in the November 2020 proposed rule.

After consideration of the public comments received, we are finalizing the following changes to § 414.210(g)(9):

• We are finalizing conforming changes to § 414.210(g)(9) as proposed, consistent with section 3712(a) and (b) of the CARES Act, but we are omitting the language in section 3712(b) of the CARES Act that references an effective date that is 30 days after the date of enactment of the law.

• We are finalizing our proposed revision to § 414.210(g)(9)(iii), which describes the 50/50 fee schedule adjustment blend for items and services furnished in rural and non-contiguous areas, to address dates of service from June 1, 2018, through December 31, 2020, or through the duration of the emergency period described in section