IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAROL A. LEWIS, and DOUGLAS B.
SARGENT, on behalf of themselves and all
others similarly situated,

     *Plaintiffs,*

     v.

ALEX AZAR, in his capacity as Secretary
of the United States Department of Health
and Human Services,

     *Defendant.*

Case No. 18-cv-2929 (RBW)

JURY TRIAL DEMANDED

**PLAINTIFFS' OPPOSITION TO THE SECRETARY'S MOTION**

# TABLE OF CONTENTS

I.   BACKGROUND ................................................................................................. 2

   A.   DIABETES/CGM CLAIM DENIALS ......................................................... 2

   B.   CMS "RULINGS" .................................................................................... 3

   C.   THE SECRETARY HAS DENIED CGM CLAIMS ON
       MULTIPLE, INDEFENSIBLE GROUNDS ...................................................... 6

   D.   TIMELINE OF THE SECRETARY'S VARIOUS CHANGES ......................... 8

   E.   VOLUNTARY CESSATION ....................................................................... 9

II.  DISCUSSION .................................................................................................. 13

   A.   THE SECRETARY'S COMMENTS REGARDING THE
       CLAIMS-IN-SUIT AND REQUESTED RELIEF .......................................... 13

   B.   THIS CASE IS NOT MOOT ...................................................................... 14

     1.   *"Voluntary Cessation"* ................................................................. 14

       a)   The Secretary Cannot Show That It Is Absolutely Clear that the Wrongful
          Behavior Could Not Reasonably Be Expected to Recur ....................... 15

         i.   The *Bona Fides* of the Expressed Intent ............................. 15

         ii.   Effectiveness of Discontinuance .................................... 16

         iii.  The Character of the Past Violations ................................ 18

       b)   The Secretary Cannot Show That Interim Relief or  Events Have Completely
          and Irrevocably Eradicated  the Effects of the Alleged Violation ....................... 19

     2.   *"Capable of Repetition While Evading Review"* ......................... 20

III. CONCLUSION ............................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Bloom v. Azar*,
  2018 WL 583111 (D. Vermont Jan. 29, 2018),
  *reversed in part on other grounds*, 976 F.3d 157 (2nd Cir. 2020) ............................................... 9

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) ............................................................................................................. 13

*City of Mesquite v. Aladdin's Castle*,
  455 U.S. 283 (1983) ............................................................................................................. 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) ............................................................................................................. 12

*Gray v. Sanders*,
  372 U.S. 368 (1963) ......................................................................................................... 14, 19

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) .......................................................................................................... 13, 18

*Ibrahim v. U.S. D.H.S.*,
  912 F.3d 1147 (9th Cir. 2019) ............................................................................................. 21

*J.T. v. District of Columbia*,
  983 F.3d 516 (D.C. Cir. 2020) ............................................................................................. 23

*Knox v. S.E.I.U.*,
  567 U.S. 298 (2012) ................................................................................................. 13, 14, 18

*Lewis v. Azar*,
  308 F.Supp.3d 574 (D. Mass. 2018) ...................................................................................... 9

*Los Angeles County v. Davis*,
  440 U.S. 625 (1979) ............................................................................................................. 13

*Olsen v. Becerra*,
  2021 WL 3683360 (E.D. Wash. April 4, 2020) ................................................................. 4, 10

*Olsen v. Becerra*,
  Case No. 21-cv-326 (E.D. Washington) ................................................................................. 8

*Smith v. Becerra*,
  Case No. 21-cv-047 (D. Utah) ................................................................................................ 8

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S.Ct. 2012 (2017) .................................................................................. 15

*U.S. v. Oregon State Medical Soc.*,
  343 U.S. 326 (1952) ...................................................................................... 13

*U.S. v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ...................................................................................... 12

*Walling v. Helmerich & Payne, Inc.*,
  323 U.S. 37 (1944) .................................................................................. 14, 18

*West Virginia v. E.P.A.,*
  142 S.Ct. 2587 (2022) .................................................................................. 15

**Statutes**

28 U.S.C. § 2412 ............................................................................................... 21

42 U.S.C. § 1395hh ............................................................................... 6, 7, 10, 24

42 U.S.C. § 1395hh(e) ......................................................................................... 8

42 U.S.C. § 1395x(n) ........................................................................................... 6

**Other Authorities**

"Report of a Workgroup of the American Diabetes Association and the Endocrine Society",
  Diabetes Care, April 2013 ............................................................................. 6
Endocrine Practice, Vol. 16, No. 5, September/October 2010 (American Association of Clinical
  Endocrinologists) ......................................................................................... 5
J. Clinical Endocrinal Metabolism, October 2001 (the Endocrine Society) .................................. 6

**Regulations**

42 C.F.R. § 401.108 ............................................................................................ 6
42 C.F.R. § 405.1063(b) ....................................................................................... 8
42 C.F.R. § 405.352 ........................................................................................... 17
42 C.F.R. § 414.202 ............................................................................................ 6
42 C.F.R. §§ 401.108(c); 405.1063(b) ........................................................................... 7

The conduct complained of in this case has earned the rare distinction of being determined to constitute actual "bad faith" by the Secretary.  *See Olsen v. Becerra*, 2021 WL 3683360 (E.D. Wash. April 4, 2020) at *2 ("Altogether, [the Secretary's] conduct meets the 'high threshold' for an award of bad-faith fees.") (hereinafter, "*Olsen I*").

In October 2015, Carol Lewis received a Dexcom G5 CGM, including transmitter, receiver, and sensors.  Thereafter, in bad faith, the Secretary denied Ms. Lewis' claims for CGM coverage on the grounds that a CGM is "precautionary" – a non-statutory/non-regulatory (*i.e.*, made up) term.  *See* AR75-82.  This same bad faith rationale was used to deny the claims of thousands of other CGM claimants and, statistically speaking, those denials resulted in deaths. When Ms. Lewis appealed to the MAC, in violation of the statutory requirements, the MAC did not issue a decision for more than two years.  Ultimately, the MAC simply failed to do its statutory duty and this suit followed.

In August 2016, Mr. Sargent received supplies for use with his Medtronic CGM. Thereafter, in bad faith, the Secretary denied Mr. Sargent's claim on the "precautionary" grounds bolstered by the illegally issued, bad faith Ruling of CMS 1682-R.  *See* AR1993-2003.  After a MAC decision in October 2018, this suit followed.

In April 2017, Mr. Sargent received supplies for use with his Medtronic CGM.  Thereafter, relying on the illegally issued, bad faith Ruling of CMS 1682-R, the Secretary denied Mr. Sargent's claim.  The denial was grounded on the bad faith assertion that a CGM is not "primarily and customarily used to serve a medical purpose."  *See* AR966-75.  That same illegal, bad faith Ruling was used to deny the CGM claims of tens of thousands, and, statistically speaking, those denials resulted in the deaths of thousands.  After a MAC decision in October 2018, this suit followed.

Ms. Lewis and Mr. Sargent filed this suit in December 2018, and, since that time, this Court has not addressed the merits, except to rule against the absent class members lacking class representatives or counsel. *See, e.g.*, Dkt. #73 and #114.  Through this very moment, the Secretary denies that Ms. Lewis and Mr. Sargent's CGMs/claims are covered "durable medical equipment" and that CMS 1682-R issued illegally. *See* Dkt. #83.

As a result of activity in other cases, the Secretary has decided to change tactics.  While the Answer in this case still swears otherwise, after more 10 years of bad faith conduct (more than five of which were founded on the illegally issued, bad faith CMS 1682-R), the Secretary now says that he will cover CGMs going forward.  Given the long-standing, illegal, bad faith conduct by the Secretary, its character, the Secretary's continued claim that his past conduct was lawful, and the absence of any mechanism (other than an injunction) to prevent a repeat of the conduct that has led to the deaths of so many, the Secretary has not and cannot meet his "heavy"/"formidable" burden to establish that this case is moot.

## I.      BACKGROUND

### A.      Diabetes/CGM Claim Denials

A continuous glucose monitor is designed, principally, to prevent severe hypoglycemic events.  Each severe hypoglycemic event results in some amount of brain damage and, *inter alia*, can lead to blindness and death.  To Plaintiffs' knowledge, well before 2015, EVERY private insurance company covered CGMs, at least in part because the preeminent medical groups had defined CGMs as the standard of care.  *See, e.g.*, Endocrine Practice, Vol. 16, No. 5, September/October 2010 (American Association of Clinical Endocrinologists); J. Clinical

Endocrinal Metabolism, October 2001 (the Endocrine Society); "Report of a Workgroup of the American Diabetes Association and the Endocrine Society", Diabetes Care, April 2013.[1]

As Plaintiffs have pointed out in other papers, during the period December 2012-July 2019,[2] approximately 80,000 persons and more than 350,000 CGM claims were denied on the grounds that a CGM is not "durable medical equipment."  Just focusing on CMS 1682-R and the period January 12, 2017-July 2019, Plaintiffs estimate that, over 250,000 claims submitted by more than 26,000 people were denied on the illegal, bad faith allegation that a CGM is not "primarily and customarily used to serve a medical purpose."  *See* Dkt. #81 at 1-2.  Further, these totals were increasing by ~13,000 claims/month.

As provided in 42 U.S.C. § 1395x(n), Medicare covers "durable medical equipment."  That phrase is only defined by examples, including "blood glucose monitors."  Throughout all the time before May 13, 2022 (*i.e.*, since at least 2011), the Secretary has contended that a CGM is not a "blood glucose monitor."  *See, e.g.*, AR1996.

The Secretary has also promulgated regulations further defining "durable medical equipment" as items that meet a five-part test, including that the item be "primarily and customarily used to serve a medical purpose."  *See* 42 C.F.R. § 414.202.

**B.     CMS "Rulings"**

There is no statute providing for CMS' "rulings."  Instead, using the power provided by 42 U.S.C. § 1395hh to issue regulations (subject to notice and comment), the Secretary created "CMS Rulings."  42 C.F.R. § 401.108.  No process is prescribed for CMS "rulings."  Instead, CMS "rulings" are simply described as something issued under CMS' authority that is binding on all

---

[1] Another reason is because CGMs save money.  Hypoglycemic events are expensive because they result in calls to paramedics, ambulance rides, stays in hospitals, and medical complications, which are themselves costly.

[2] The only period for which Plaintiffs have partial discovery.

levels of claim consideration.  42 C.F.R. §§ 401.108(c); 405.1063(b).  While § 401.108 says that "rulings" may be published, to date, none ever has been.  Not including the "rulings" at issue in this case, the Secretary has issued 27 "rulings" without complying with the notice and comment provisions of 42 U.S.C. § 1395hh.[3]  Thus, CMS' "rulings" are simply letters signed by someone at the Department.  As contended by the Secretary in other proceedings, CMS "rulings" can be rescinded at any time and nothing prevents the Secretary from rescinding a "ruling" within days of its issuance, even in as little as a day.  *See* Exhibit 1, Transcript at 24:16-23.

On January 12, 2017, the Secretary illegally issued and adopted a bad faith policy declaring that CGMs were not "durable medical equipment." This was so, the Secretary alleged, because CGMs were not "primarily and customarily used to serve a medical purpose." CMS 1682-R.  That document was signed by Patrick Conway, M.D.  That is, knowing the deaths, etc. that would result from denying people CGM coverage, on behalf of the Secretary, "*medical doctor*" Patrick Conway signed CMS 1682-R.  It is undisputed that CMS 1682-R issued without complying with the notice and comment requirements of 42 U.S.C. § 1395hh.

Thus, CMS 1682-R became just the latest basis on which the Secretary denied CGM claims stretching back to at least 2011, when Carol Lewis' first CGM claim was rejected.

However, in one regard, CMS 1682-R did provide for coverage of a CGM device.  When all the restrictions, etc., were taken into account, only one CGM would have been considered "primarily and customarily used to serve a medical purpose and, therefore, covered "durable medical equipment."  That device was/is the Dexcom G5 model.  That is, the very device provided to Ms. Lewis in 2015, for which coverage was denied on the grounds that it is not "durable medical equipment" and whose coverage the Secretary's Answer in this case still denies, was deemed

---

[3] https://www.cms.gov/Regulations-and-Guidance/Guidance/Rulings/CMS-Rulings

covered "durable medical equipment."  In Plaintiff's view, this preposterous position is just another example of the bad faith conduct engaged in by the Secretary recognized by *Olsen I*.

Because no relief was forthcoming from this Court over several years, multiple other cases challenging the Secretary's conduct were filed.  The proceedings in two are most relevant.  In *Olsen II*, the Secretary continued to deny Olsen's claims based on CMS 1682-R even after that same court had found that such a denial constituted "bad faith."  Thus, a second case was filed on November 18, 2021.  *See Olsen v. Becerra*, Case No. 21-cv-326 (E.D. Washington).  In that case, the filing itself and Olsen's immediate motion for preliminary injunction (combined with a pending motion for summary judgment on the same issue in the *Smith* case (infra)) appears to have prompted both the December 2021, alleged change as well as the February 2022 issuance of what the Secretary calls a "TDL."[4]

In *Smith*, Smith likewise challenged the illegal, bad faith denials.  *Smith v. Becerra*, Case No. 21-cv-047 (D. Utah).  When the District Court there merely ordered payment of the claims-in-suit and did not address the underlying legal issues, Smith appealed to the Tenth Circuit and oral argument was scheduled for May 17, 2022.  That appeal and the prospect of trying to defend the indefensible appears to be what prompted the issuance of CMS 1783-R on May 13, 2022 (*i.e.*, the Friday before a Tuesday appellate argument).

At oral argument in *Smith*, the Secretary made several representations/arguments that are relevant hereto.  First, the Secretary conceded that CMS 1783-R could be rescinded in as little as a day.  *See* Exhibit 1, Transcript at 24:16-23.  Indeed, by the Secretary's logic, any CMS "ruling"

---

[4] In other fora, the Secretary falsely represented that the TDL meant that all CGM claims with dates of service prior to March 1, 2022, would be covered.  First, the TDL only applied to Medicare Part B, not Medicare Part C that constitutes ~one third of all Medicare insureds.  Thus, CMS 1692-R would still have applied to ~4,000 claims/month. Second, of course, it was premised on the idea that all levels of the Medicare claims process would act in violation of 42 C.F.R. § 405.1063(b).  Third, given its alleged retroactive nature, such a claim would be in violation of 42 U.S.C. § 1395hh(e) ("retroactivity of substantive changes") without findings that were not made.

can be promulgated/rescinded without complying with notice and comment. Further, even if illegal and resulting in deaths, the Secretary contends (as he has before multiple courts) that the judiciary is powerless to stop his illegal conduct. Second, the Secretary continued to defend the legality of his conduct, as he does here. *See* Exhibit 1, Transcript at 26:1-15.

## C.     The Secretary Has Denied CGM Claims On Multiple, Indefensible Grounds

In his current papers, the Secretary trots out his latest rationale for why he had been denying CGM claims, yet this just highlight the bad faith the *Olsen I* court already found. By Plaintiffs' count, this is the fourth such rationale/excuse. At base, of course, the Secretary has always denied that CGM's are "blood glucose monitors" as provided in the statute. This was so, the Secretary contended because - even though a CGM reports blood glucose values - those values are based on a correlation with sensed interstitial glucose values.

From the false premise that CGMs are not "blood glucose monitors", the Secretary has offered a series of meritless arguments why CGMs are not "durable medical equipment." Originally, as shown in the denial of Lewis' claim and one of Sargent's claims in this case, the Secretary rejected claims on the non-statutory/non-regulatory grounds that a CGM was "precautionary." *See also Lewis v. Azar*, 308 F.Supp.3d 574 (D. Mass. 2018). At times, the Secretary also rejected CGM claims on the grounds that only the "primary" medical device to treat a condition was "durable medical equipment", rather than the regulatory requirement that a device would be considered "durable medical equipment" if it was "primarily and customarily used to serve a medial purpose." *See Bloom v. Azar*, 2018 WL 583111 (D. Vermont Jan. 29, 2018), *reversed in part on other grounds*, 976 F.3d 157 (2nd Cir. 2020).

With the issuance of CMS 1682-R, the Secretary formalized his "precautionary" position into the more bold, but false, claim that a CGM is not "primarily and customarily used to serve a medical purpose."

Thereafter, in litigations, the Secretary alleged that the CGM claims were rejected on the grounds of accuracy, rather than the actual basis that a CGM is "precautionary"/not "primarily and customarily used to serve a medical purpose."  In another litigation, the Secretary's claim in this regard was found for constitute a "bad faith mischaracterization" (*Olsen v. Becerra*, 2021 WL 3683360 at *2).  Thereafter, the Secretary repeated that false claim in this case without consequence.  *See* Dkt. #99 at 5.

In his latest rationale, after thousands of avoidable deaths, the Secretary contends that this was all just a mistake.  In fact, the Secretary now understands that a CGM (whether connected to an insulin pump or not) is a "blood glucose monitor" and, therefore, is "durable medical equipment" as defined by the statute.  Of course, had the Secretary complied with the notice and comment requirements, the Secretary would have learned this from the public years earlier.

In the *Smith* litigation and now here, the Secretary trots out the coined phrase "insulin pumps that can also perform the function" of a CGM - s*ee, e.g.*, Mot. at 6 – yet this does not justify the years of baseless, bad faith denials.

Thus, as now contended by the Secretary – he just made a mistake – a mistake that the Secretary made for over a decade and more than 375,000 times against more than 88,000 people (just through July 2019).

Importantly, one mistake the Secretary does not concede is that he acted illegally when he violated the laws of Congress by issuing CMS 1682-R without complying with the notice and comment provisions of 42 U.S.C. § 1395hh, with the consequential thousands of deaths.

**D.     Timeline of the Secretary's Various Changes**

The timing of some of the relevant events is summarized below:

| | |
|---|---|
| Prior to January 2017 | Numerous ALJs rejected the Secretary's position that CGMs are not "durable medical equipment" because they are "precautionary." Three federal lawsuits filed challenging Secretary's claim. |
| January 12, 2017 | The Secretary issues CMS 1682-R without complying with the notice and comment provisions of 42 U.S.C. § 1395hh. |
| November 4, 2020 | This case was already on file.  The Secretary was facing a request for attorney's fees based on "bad faith" in the *Zieroth* case.  After a nine moth delay in this Court, the *Olsen I* case was transferred to the Eastern District of Washington and the Secretary faced a motion for summary judgment. |
| April 2021 | The Olsen Court found both the Secretary's underlying position and his litigation conduct constituted "bad faith" and awarded market rate attorney's fees to the plaintiff. |
| December 28, 2021 | Before this date, a motion for summary judgment seeking an injunction against CMS 1682-R was fully briefed in the *Smith* case. Because the Secretary continued to deny Olsen's claims on the bad faith grounds, even after the finding of bad faith, the *Olsen II* case was on filed.  A motion for preliminary injunction was on file in this case.  On December 28, 2021, the Secretary publishes his intent to adopt a new rule for CGM coverage effective March 1, 2022, only for claims with dates of service on or after March 1, 2022. |
| February 25, 2022 | The Secretary sends the "TDL" to some entities contending that the "new" rule will also potentially apply to Medicare Part B (but not Part C) claims with dates of service prior to March 1, 2022.  The Secretary then argues that the *Olsen II* case is moot. Olsen points out that, on its face, CMS 1682-R was not rescinded and that, even assuming the TDL was effective, ~4,000 CGM claims/month would still be denied based on CMS 1682-R. |

8

| March 31, 2022 | The *Olsen II* Court holds that the case is not moot. |
| May 17, 2022 | Smith appealed to the Tenth Circuit seeking an injunction against CMS 1682-R.   Oral argument scheduled for May 17, 2022.   On May 13, 2022 (a Friday), without notice and comment, the Secretary issued CMS 1738-R purportedly rescinding CMS 1682-R.   At oral argument the following Tuesday, the Secretary argues that the case is moot. |

The Secretary contends that his changes "expanded Medicare coverage of CGM devices." Mot. at 9.  That is false.  CGMs have always been covered by Medicare because they are "blood glucose monitors" that are expressly covered by the statute.  Further, of course, CGMs have always been "primarily and customarily used to serve a medical purpose" and, therefore, also covered under the Secretary's own regulations.  Rather than "expanding" coverage, at best, the Secretary pledges to follow the law – after a decade of refusing to, including more than 5 years of illegal, bad faith conduct.

## E.   Voluntary Cessation

As held by the Supreme Court in *U.S. v. W.T. Grant Co*., 345 U.S. 629, 632 (1953) (cleaned up):

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.  A controversy may remain to be settled in such circumstances, *e.g.*, a dispute over the legality of the challenged practices.  The defendant is free to return to his old ways.  This, together with the public interest in having the legality of the practices settled, militates against a mootness conclusion. … The courts have rightly refused to grant defendants such a powerful weapon.

While a defendant can try to prove "no reasonable expectation that the wrong will be repeated," its burden "is a heavy one." *Id*. at 633; *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 189-190 (2000) (standard is "stringent" and the burden is "formidable").  Even if a

defendant ceases the challenged conduct, the plaintiff's claims will be moot *only* if the defendant proves that (1) "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *and* (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).  As explained by the Supreme Court, a mere alleged change in behavior and a professed disclaimer of any intention to revive the conduct does not suffice to make a case moot, but they are factors to be considered.  *Grant*, 345 U.S. 633 ("Such a profession does not suffice to make a case moot …").

When considering "reasonable expectation", *inter alia*, a court should consider: 1) the *bona fides* of the expressed intent to comply; 2) the effectiveness of the discontinuance; [5] and 3) the character of the past violations.  *Grant*, 345 U.S. at 633.

With regard to *bona fides*, efforts to defeat judicial review (whether to avoid a sanction or insulate a prior decision) counsel against a finding of mootness.  *See, e.g., Knox v. S.E.I.U.*, 567 U.S. 298, 307 (2012) (post-certiorari change "must be viewed with a critical eye"); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000) ("Our interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here."); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 (1987) (mootness doctrine "also protects plaintiffs from defendants who seeks to evade sanction by predictable protestations of repentance and reform." (cleaned-up)); *U.S. v. Oregon State Medical Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of

---

[5] The Supreme Court's dismissal and vacatur in *New York State Rifle & Pistol Assoc., Inc. v. City of New York*, 140 S.Ct. 1525 (2020) is perhaps the best illustration of "effectiveness of discontinuance."  There, a City ordinance was challenged.  After certiorari was granted, the City amended the ordinance to remove the offending provision.  While that would be typical "voluntary cessation" and suspect effort to manipulate jurisdiction, importantly, the State of New York also amended its laws precluding the City from enacting a similar ordinance in the future.  *Id*. at 1526 ("After we granted certiorari, the State of New York amended its firearm licensing statute …").  Thus, at least in part because a power higher than the City itself precluded repetition, the Supreme Court vacated and remanded.

efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption.").

A significant factor in making the "reasonable expectation" determination is whether the defendant continues to maintain that its prior conduct was lawful.  If so, then there is no reason to expect that a defendant will refrain from engaging in that conduct in the future, despite a momentary change.  Thus, for example, in *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944), shortly after a district court case was filed challenging the legality of defendant's use of split-day contracts, the defendant discontinued using them.  Nevertheless, the Supreme Court held that the case was not moot because the defendant "has consistently urged the validity of the split-day plan and would presumably be free to resume the use of this illegal plan were not some effective restraint made.  Thus, there is an actual controversy, and adverse interest."  *Id*. at 42-43 (cleaned-up).

Likewise, in *Knox*, the union defended the legality of its "Political Fight-Back Fee" through and including the grant of cert.  However, after cert. was granted, the union sent of a notice offering a refund and then argued that the case was moot.  Rejecting this claim, the Supreme Court noted: "since the union continues to defend the legality of the Political Fight-Back Fee, it is not clear why the union would necessarily refrain from collecting *similar* fees in the future."  567 U.S. at 307 (emphasis added).

Yet another factor is how long the challenged policy has been in effect.  *See Gray v. Sanders*, 372 U.S. 368, 376 (1963) ("In addition, the voluntary abandonment of a practice does not relieve a court of adjudicating its legality, particularly when the practice is deeply rooted and long standing.").

Further, government actors are put to the same heavy burden, formidable burden, and stringent standard as private actors. For example, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017), at issue was a State program providing grants to purchase rubber playground surfaces for schools. Plaintiff's application was denied because Plaintiff is a religious organization. Plaintiff then filed suit based on violation of the Free Exercise Clause of the First Amendment and its case was dismissed by both the District Court and the Court of Appeals. Shortly before oral argument at the Supreme Court, the Governor of the State directed the relevant department to no longer deny applications based on religious status. Nevertheless, the Supreme Court found that the case was not moot. This was so because the State could not carry its "heavy burden" of making it "absolutely clear that it could not revert to its policy of excluding religious organizations." *Id.* at 2019, n. 1.[6]

Likewise, in *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283 (1983), at issue was a city ordinance barring licenses to establishments with "connections to criminal elements." On suit by Aladdin, that phrase was held unconstitutionally vague. After the Supreme Court granted *certiorari*, the City amended the ordinance to eliminate the phrase. Nevertheless, the Supreme Court held that the case was not moot. As stated by the Supreme Court: "In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Id.* at 289. *See also West Virginia v. E.P.A.,* 142 S.Ct. 2587, 2607 (2022).

---

[6] Indeed, the State conceded that "there is no clearly effective barrier that would prevent the Department from reinstating its policy in the future." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019, n. 1 (2017) (cleaned-up).

## II.      DISCUSSION

**A.      The Secretary's Comments Regarding the Claims-in-Suit and Requested Relief**

As set forth in the Complaint, Plaintiffs sought, *inter alia*:

1) An order setting aside CMS 1682-R;

2) A finding that CGMs are "durable medical equipment" with under both the statute and the Secretary's regulations;

3) A specific declaration that the Medtronic MiniMed and Dexcom CGMs are "durable medical equipment"; and

4) An order directing the Secretary to provide coverage of the claims-in-suit.

*See* Dkt. #1 at 32.  Other than the last item, these requests are not co-extensive with Plaintiffs' requests for coverage.  That is, regardless of whether the claims-in-suit are covered, Plaintiffs sought an order setting aside CMS 1682-R.  Likewise, even if the claims-in-suit are covered/paid, Plaintiffs sought various determinations regarding CGMs.

The Secretary's proposed order grants none of the above requests for relief.  *See* Dkt #120, Exhibit 9.  The requested relief in each of these cases would have real world impact.  For example, a determination that the CGMs used by Ms. Lewis and Mr. Sargent are "durable medical equipment" within the statute and regulations would have the effect of estopping the Secretary from contending otherwise in future claims by Ms. Lewis and Mr. Sargent.

Further, as proposed by the Secretary, there is no order that the Secretary provide coverage of the claims-in-suit.  Apparently, the Secretary contends that such an order is not appropriate.  The Secretary contends that his other steps mean that he has already paid the claims and "there is

no reasonable expectation that the Secretary would try and recoup the payments." Mot. at 16.[7] Absent an order from this Court, the Secretary could seek recoupment of payments made, which he can enforce by automatically deducting it from Social Security payments. *See, e.g.*, 42 C.F.R. § 405.352. While "reasonable expectation" that the Secretary might do so is not the relevant legal standard,[8] the reasonableness of any expectation has to be based on the Secretary's past conduct. The Secretary's past conduct shows that he can be expected to take any bad faith, illegal step, even if he knows it will result in deaths.

**B.    This Case Is Not Moot**

In addition to the reasons set forth above, this case is not moot because the Secretary has failed to sustain his burden of showing that his alleged "voluntary cessation" has rendered this case moot.

**1.    "Voluntary Cessation"**

With respect to Sargent's cause of action and request for relief related to CMS 1682-R, the Secretary cannot meet his "heavy burden", "formidable burden", and "stringent standard" to establish mootness. Indeed, all the Secretary offers is that he has voluntarily ceased the complained of conduct (though the Secretary seeks to keep the spoils of his illegal conduct) and professes that he lacks an intent to revive the conduct. As explained by the Supreme Court in *Grant*, that is not sufficient to carry the Secretary's "heavy"/"formidable" burden.

---

[7] Despite the Secretary's claims, Mr. Sargent has received absolutely nothing. While a check was received by Ms. Lewis, she considers that merely an offer to settle, which she rejects.

[8] A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small in in the outcome of the litigation, the case is not moot." *Knox*, 576 U.S. at 307-308 (cleaned up).

> **a)** **The Secretary Cannot Show That It Is Absolutely Clear that the Wrongful Behavior Could Not Reasonably Be Expected to Recur**

Essentially, every red flag regarding the Secretary's conduct/intentions is present in this case.

> **i.** **The *Bona Fides* of the Expressed Intent**

First, of course, the timing of the Secretary's change screams mere tactics to avoid judicial review. Depending on when considered, the alleged change occurred either little more than one business day before oral argument (May 13, 2022) in the related *Smith* appeal, or, at best, on December 28, 2021, after summary judgment was fully briefed in this case, a motion for preliminary injunction was pending in another case, and the Secretary faced the prospect of appearing before the "bad faith" judge in *Olsen II* for repeating the bad faith conduct. That is, after more than a decade (or five years) of rejecting CGM claims, the Secretary changed his position when he faced a possible reckoning for his indefensible position. *Knox*, 567 U.S. at 307; *Gwaltney*, 484 U.S. at 67 ("predictable protestations of repentance and reform").

Second, the Secretary continues to defend his illegal conduct and that is combined with his assertion that he is not subject to the power of the courts. *Walling*, 323 U.S. at 42-43; *Knox*, 567 U.S. at 307; Dkt. #99 at 7-11.

Even at oral argument in *Smith* (*i.e.*, less than three months ago), the Secretary continued to defend his bad faith conduct. *See* Exhibit 1, Transcript at 26:1-15:

> I don't think that there is a history of bad faith. Even after some district courts have ruled that continuous glucose monitors are durable medical equipment, CMS did continue to apply the 2017 CMS ruling, as it was entitled to do, with regard to other Medicare beneficiaries or other claims.
>
> Of course, if there had been a Court of Appeals ruling on that issue, CMS would have had a different policy within that circuit. If there had been a Supreme Court ruling, of course, that would have been definitive. But CMS was entitled to continue to apply that ruling and continue to test the ruling in court.

Yet another factor is whether the challenged practice is deeply rooted and long standing. *Gray*, 372 U.S. at 376. As detailed above, the Secretary has been denying CGM claims improperly for more than a decade. Indeed, CMS 1682-R was promulgated, apparently, in response to the numerous losses the Secretary had suffered before his own ALJs and the three district court actions that had been filed. Thus, CMS 1682-R allowed the Secretary to more effectively deny CGM claims on bad faith, illegal grounds.

During the more than 5 years it has been in effect, the Secretary has steadfastly sought to delay and resist every effort to have the legality of CMS 1682-R decided. Indeed, the Secretary continued to enforce the illegal policy even after a rare finding of "bad faith." Thus, the challenged practice is deeply rooted and long standing.

### ii.        Effectiveness of Discontinuance

At oral argument on appeal in the *Smith* case, the Secretary conceded that 1738-R could be rescinded with a simple signature the next day. Transcript at 24:16-23 ("JUDGE CARSON: **Can that be rescinded tomorrow?** MR. KOPPEL: **In theory, it could be rescinded** …") (cleaned-up, emphasis added). Further, given the Secretary's repeated claim that he can act in violation of § 1395hh and that Courts are powerless to stop him, there is likewise no reason that the "new rule" published on December 28, 2021, could not be eviscerated by another "letter" from the Secretary. Given the Secretary's admissions in this regard, the Secretary's quotation of cases discussing "structural obstacles to reimposing" challenged conduct are particularly inapt.

Moreover, rather than act as a check on the Secretary, the ALJs within the Department and the MAC can be counted on to be willing participants in the Secretary's defiance of the laws passed by Congress and bad faith, even when they know that it will result in great bodily harm, including death. As noted in other papers, those who were not deceived by the Secretary's misrepresentation

about the basis for denial of their CGM claims (*i.e.*, "statutorily excluded")[9] or concealment of the reasons for denial, pursued appeals. In those appeals, ALJs rejected CGM claims on the bad faith, illegal grounds, and the MAC did so as well more than 140 times. *See* Dkt. #63 at 10. Thus, the ALJs and the MAC have shown that they will follow any policy of the secretary, even if issued illegally and enforced in bad faith, and will not act as a check on the Secretary.

The Secretary's motion itself demonstrates the ineffectiveness of the Secretary's discontinuance. As posited by the Secretary, if he denies, Sargent's claims in the future (*e.g.*, by illegally issuing another "ruling" classifying CGMs as snow cone machines and, therefore, not medical devices), "review … would be provided through the Medicare statute's administrative and judicial review mechanisms." Mot. at 14. As shown by the conduct over at least the last five years, it is to be expected that all levels within the Department would fall in line and begin rejecting CGMs on the grounds that they were snow cone machines. Even if the Secretary actually complied with the statutory deadlines to issue decisions (which he does not), it would be as long as 360 days before Mr. Sargent's claim would be ready for judicial review.[10] This case illustrates what could be expected to follow next. Mr. Sargent could expect a more than 3-year delay from that point. Thus, as posited by the Secretary, his discontinuance/resumption *might* be reviewed some 4 years after the fact.

Thus, just as in *Trinity Lutheran*, absent an order from the Court, there is "no clearly effective barrier that would prevent the Department from reinstating its policy in the future." *Trinity Lutheran*, 137 S.Ct. at 2019, n. 1.

---

[9] That fraudulent claim rings particularly rich now that the Secretary concedes that, rather than "statutorily excluded", coverage of CGM is explicitly required by the statute.

[10] Computed by adding up the maximum times allowed for decision at the various levels of review as set forth in the statute.

### iii.      The Character of the Past Violations

The character of the past violations is of the worst sort.  Having taken insurance premiums from ill and elderly persons on the pretense that qualifying claims would be covered, the Secretary engaged in a decade long scam where life-saving CGM claims were denied on bad faith grounds. When that approach faced opposition from the Secretary's own ALJs and the Court's, the Secretary reacted by issuing the illegal CMS 1682-R, in furtherance of which, the Secretary actually got a doctor (Patrick Conway) to sign his name to a paper contending that a CGM is not "primarily and customarily used or a medical purpose."  The Secretary took these steps knowing that tens of thousands would be irreparably injured and an untold number (but at least thousands) would die as a result.  Plaintiffs note that the Secretary has never disputed claims regarding the number of people hurt by the Secretary's misconduct.

When the district courts held that the Secretary was wrong, the Secretary ignored them/contended that the district courts should defer to the Secretary's greater wisdom.  *See, e.g.*, AR1999.  The whole purpose of the Equal Access to Justice Act is to deter unreasonable government action.  28 U.S.C. § 2412; *Ibrahim v. U.S. D.H.S.*, 912 F.3d 1147, 1166 (9th Cir. 2019) ("deter the unreasonable exercise of Government authority").  Nevertheless, even after attorney's fees were awarded against the Secretary for his unreasonable denial of CGM claims, the Secretary continued to deny CGM claims on these same grounds.  Indeed, when a rare bad faith finding was made against the Secretary, he as unmoved and continued to deny CGM claims on the same bad faith grounds, even as to the insured (Olsen) who obtained the bad faith ruling.  Indeed, the Secretary continued to defend his misconduct through and including oral argument in the Smith appeal on May 17, 2022.

Further, the Secretary's position that a CGM is not "primarily and customarily used to serve a medical purpose" is, on its face, non-sensical and irrational. The fact that the Secretary has defended that position for mor than five years illustrates that there is no position that is beyond the Secretary, even when death is the known result.

The character of the past violations, literally found to constitute "bad faith", are of the worst sort.

b)    **The Secretary Cannot Show That Interim Relief or Events Have Completely and Irrevocably Eradicated the Effects of the Alleged Violation**

Simply focusing on CMS 1682-R, the Secretary has not shown that the effects of his illegal conduct has been completely and irrevocably eradicated. Indeed, rather than eradicate the effects of the illegal issuance of CMS 1682-R, the Secretary seeks to lock them in in two ways. First, as stated in CMS 1738-R, the Secretary refuses to revisit and grant all the claims for CGM coverage that were denied on the basis of the illegally issued and bad faith CMS 1682-R. Based on information produced in this case, *this amounts to well more than 250,000 claims that were denied illegally*, just through July 2019. *See* Dkt. #81 at 2. Thus, the Secretary seeks to retain the fruits of his massive misconduct.

Second, given the five years that the Secretary has illegally enforced CMS 1682-R and the uniformity with which the Secretary denied clams, tens of thousands of Medicare insureds have been improperly dissuaded from even submitting claims. As noted in other papers, Medicare insureds have up to one year from a date of service to submit a claim for coverage. Thus, even for claims with dates of service between June 1, 2022 and before March 1, 2023, those insureds still have the ability to submit claims for CGM coverage – *if they knew that the policy barring coverage had changed*. However, in CMS 1738-R, the Secretary explicitly refused to publish the allegedly changed policy and nothing has been published in the FEDERAL REGISTER. Thus, CMS 1738-R is

a secret policy and insureds are losing their right to coverage, as a result of the concealment.  So, again, the effects have not been completely and irrevocably eradicated.

Rather than sustain his burden on this issue, the Secretary does not even mention it.

### 2.    "Capable of Repetition While Evading Review"

With respect to the "capable of repetition while evading review" grounds, again, the Secretary did not meet his burden.  As an initial matter, the Secretary contends that his conduct in illegally issuing bad faith Rulings is not of the type that is so short as to not be fully litigated.  Mot. at 14.  This very case shows the exact opposite.  Sargent is here litigating his April 2017 claim. That is, Sargent has been litigating the Secretary's illegal, bad faith conduct that results in death for more than five years.  After proceeding for more than a year and a half before the Department, Sargent filed this case in December 2018, where this case has remained for more than three and a half years.

As set forth in *J.T. v. District of Columbia*, 983 F.3d 516 (D.C. Cir. 2020), the "capable of repetition while evading review" exception applies if : 1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration; and 2) there was a reasonable expectation that the complaining party would be subjected to the same action again.  *Id.* at 523. "To evade review, the challenged action must be incapable of surviving long enough to undergo Supreme Court review."  The "capable of repetition" prong requires that the same parties will engage in litigation over the same issues in the future.  The "wrong" that is, or is not, "capable or repletion" is defined in terms of the legal questions it presents.  *Id.* at 524.

With regard to the "evading review" prong, given the Secretary's contention that he can issue "rulings" at any time that render multi-year cases moot, it is hard to see how a case is capable of surviving through Supreme Court review.  In the event the Secretary issues his "snow cone

maker" ruling, it will be at least a year before a complaining party could get to a district court.  All the while people would be dying.  After waiting an additional two months for service, in the event that the Secretary does not like how the litigation is going, he can, he alleges, simply issue another ruling at any time and, thereby, deprive the court of jurisdiction and evade review.  Such a step could come at any time, including for example, three days before oral argument on appeal (as happened in the *Smith* case).  Thus, the matter will evade review because, even if the insured survives through the appeal process before the Department, the Secretary could choose to evade review at any time.  Thus, the "evade review" prong is shown.

As to the "capable of repetition" prong, that is also present.  Plaintiff note that this is Ms. Lewis *second* case regarding CGM' coverage.  That is, after Ms. Lewis won a first District Court judgment finding that a CGM is covered "durable medical equipment", the Secretary continued to deny her CGM claims.  *See* Dkt. #36 at 2-4 (describing the post-judgment denials of Lewis' and Bloom's claims).  Likewise, of course, it was the post-judgment denials of Olsen's claims that led to *Olsen II*.  Thus, the Secretary has a demonstrated pattern of losing district court cases and continuing to deny claims of the same insured on the losing grounds.

Further, as discussed, the Secretary has never complied with the notice and comment provisions of 42 U.S.C. § 1395hh with respect to "rulings."  Indeed, in CMS 1783-R, the Secretary contends that it is not in the public interest that he does so.  Further, in this and other cases, the Secretary contends that even if he violates the laws of Congress, courts are powerless to stop him, no matter how many die as a result.  Thus, there is a reasonable expectation that the "wrong" of issuing "rulings" without complying with Congress' laws and baselessly denying coverage of CGM claims will recur.

### III.　　CONCLUSION

The Secretary's motion should be denied.


Dated:  August 8, 2022                              Respectfully submitted,

                                                   /s/James Pistorino
                                                   PARRISH LAW OFFICES
                                                   James C. Pistorino
                                                   788 Washington Road
                                                   Pittsburgh, PA 15228
                                                   Telephone: (412) 561-6250
                                                   Facsimile:  (412) 561-6253
                                                   james@dparrishlaw.com

                                                   Jenlain Scott
                                                   Foley & Lardner LLP
                                                   3000 K Street NW, Suite 600
                                                   Washington, D.C. 20007
                                                   jcscott@foley.com
                                                    202-295-4001

                                                   Michael Leffel
                                                   Foley & Lardner LLP
                                                   150 E Gilman St Suite 5000,
                                                   Madison, WI 53703
                                                   mleffel@foley.com
                                                   (608) 257-5035


                                                   *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify on August 8, 2022, I filed this document using the CM/ECF system, which will cause service upon all counsel of record.

*/s/ Jenlain Scott*
Jenlain Scott